JOHN T. KENNEDY and MARGARET B. KENNEDY, Appellants, v. GEORGE E. BOWLING and RAY T. BOWLING, Partners, Doing Business under Firm Name of GEORGE E. BOWLING & SON.—4 S. W. (2d) 438.

Court en Banc, March 17, 1928.

*Turpin & Behrendt* and *Henry S. Conrad* for appellants.

*Chas. A. Loomis* and *Halbert H. McCluer* for respondents.

ATWOOD, J.—This case was transferred from Division Number One to Court en Banc, where it was reassigned. The facts and most of the issues in the case were so ably dealt with in the divisional

opinion that we here adopt and literally quote much of the language of that opinion.

"This is a suit for damages. The plaintiffs are husband and wife, and in the year 1920 acquired a tract of ground at 26th Street and Southwest Boulevard in Kansas City, Missouri, on which they procured to be erected two buildings, occupied after January 1, 1921, by John T. Kennedy Sales Co., and used by that company for the storage and sale of heavy chemicals and like commodities.

"Defendants constructed the buildings for plaintiffs, upon the 'cost-plus plan.' The cost of the materials and labor was a little in excess of $135,000, and the defendants were paid for their services a commission of ten per cent thereon. The agreement, as first made, was for the construction of a three-story building, and contiguously another building of one story. After operations were begun it was agreed that the three-story building should be extended to four stories, and this was done. The controversy is over the manner of constructing the four-story building. The floors, and their supports, of that building, did not withstand the strain of the weight of the chemicals and other articles stored therein, and plaintiffs were obliged to strengthen the floors and supports. Their suit is based upon that failure, and upon the ground that defendants, knowing the contemplated use, undertook to contruct the building in such manner that the floors would withstand the strain put upon them under that use. The second amended petition alleges that in all the transactions mentioned the plaintiff John T. Kennedy acted for himself and his wife; that desiring to have such building erected, he consulted with the defendant George E. Bowling in regard to the construction of the building, and explained to him the general nature of the stock which would be placed and stored therein, and told him that it would be necessary to have a building that would carry a load of at least 250 pounds to the square foot on all floors; that at said time, and at various times thereafter, said Bowling represented to the plaintiff that the defendants had years of experience in the construction of business buildings, and had special skill and knowledge of the requirements of such buildings, and the design and construction thereof, and that he could furnish a proper design for and properly construct a building, suitable for the purpose described by plaintiff; that plaintiffs having no knowledge of the subject themselves relied upon the skill, knowledge and ability which said Bowling represented himself to have, and engaged the defendants to construct a building suitable for the purpose described.

"The petition alleges that among the terms of the agreement made, defendants agreed to design the building, prepare at their own expense plans and specifications for the same, and submit them to the

plaintiffs and to select and buy all materials and employ all labor used in the construction thereof, and plaintiffs agreed to pay for necessary materials upon delivery of invoices, and to advance the money for labor, and to pay defendants for their services ten per cent of the cost of construction; and that a memorandum in writing was made of a part of the agreement, between John T. Kennedy and defendants as follows:

> " 'Kansas City, Missouri,
> " 'September 2, 1920.

" 'Geo. E. Bowling & Son,
" 'Sharp Bldg., City.
" 'Gentlemen:

" 'I hereby propose that you shall build on my property at 26th Street and Southwest Boulevard, this city, one three-story building, and contiguously one one-story building according to plans and specifications to be furnished by you at your expense and approved by me, you to buy all material and to employ all the labor used in the construction of said building and to furnish such watchmen and caretakers as may be necessary to protect the buildings from vandalism and the material from theft.

" 'The construction of said buildings is to begin at once, the grading therefor being now in progress, and completed as quickly as possible, endeavoring to have the same ready for occupancy by the first of January, 1921.

" 'Upon the delivery to me from time to time of invoices for material used in the construction of said buildings, and duly authenticated pay-rolls for the labor employed, I will advance to you the amount thereof at your request.

" 'For your services in connection with the superintending of the said construction I will pay you 10% of the cost of construction.

" 'This letter is in duplicate copies, and if the proposition is satisfactory to you, you will please write your acceptance on one and return it to me, retaining the other copy for your own files and reference?

> " 'John T. Kennedy.

" 'Accepted:
" 'Geo. E. Bowling & Son,
" 'By Geo. E. Bowling.
" 'Ex. 2-R. C. A.'

''The petition further alleged that thereafter 'defendants exhibited to plaintiffs a set of drawings indicating the general floor spaces, length, breadth, height and general exterior appearance of a one-story building and a three-story building, but did not at any time exhibit any specifications for said buildings; that plaintiffs at no time approved plans or specifications, but defendants proceeded with the construction of said buildings, with the representation and assurance by the defendants to plaintiffs that said larger building, if constructed under the suggested plans, would have ample strength and capacity for heavy storage purposes such as had been described to defendants, and would bear a load of 250 pounds to the square

foot, and that plaintiffs relied upon said assurances so made by defendants to them, when defendants knew the same were false, or affirmed the truth of same, without knowledge of the truth or falsity thereof;' that after the memorandum was made and the plan suggested, it was agreed that the three-story building should be four stories in height, and defendants proceeded to construct the same as a four-story building, with the representation and assurance to plaintiffs that it would have ample strength and capacity for the purposes described. The petition further alleged that defendants did construct buildings of the length and breadth, and similar in general appearance to those indicated by the plans exhibited, and plaintiffs paid the cost of materials and of labor, and paid defendants their said commission.

''The petition further alleged that the four-story building was so unskillfully designed and constructed that the floors did not sustain the weight of the described load put upon them, and that plaintiffs were obliged to undergo large expense in remedying the defects.

''The defendants were engaged in a real estate business, and also in the business of looking after the erection of buildings, for themselves and others. After a general denial, they alleged in their answer that the written contract referred to in the plaintiffs' petition was not a partial but a full statement, of all the terms and conditions agreed upon between the parties. They specifically denied that plaintiff John T. Kennedy explained to Geo. E. Bowling the nature of the stock to be placed in said building, or told him that it would be necessary to have a building that would carry a load of at least 250 pounds to the square foot. They denied that Geo. E. Bowling represented to plaintiff that defendants had many years of experience in the construction of business buildings, or especial skill and knowledge upon that subject, or could furnish a proper design for and properly construct buildings, suitable for the purpose described. Defendants alleged that they employed an architect to prepare the plans in conformity with the desires of the plaintiff; that said architect did prepare plans and specifications, and the same were submitted to John T. Kennedy and by him approved, and that defendants constructed said buildings in accordance with the said plans and specifications, and the same were accepted by plaintiffs without objection; that the supports gave way because the floors were overloaded; that the buildings were constructed of the best materials then obtainable in the market in Kansas City, and in the workmanlike manner, and with the approval of said John T. Kennedy as to materials and method, and defendants denied that plaintiffs had no knowledge of the subject themselves, and relied on the knowledge and skill which said Bowling represented himself to have.

"The court refused to give the peremptory instruction asked by defendants at the close of all the evidence in the case to the effect that under the pleadings and the evidence the verdict would be for the defendants. The case was submitted, and plaintiffs had a verdict for $13,500. Defendants filed their motion for a new trial, and motion in arrest. The court sustained the motion for a new trial, specifying of record as the ground therefor that 'the court had erred at the close of all the evidence in the case in not directing a verdict for defendants, and in not giving defendants' instruction in the nature of a demurrer to all the evidence in the case.' The court also on the same day, sustained the motion in arrest, and plaintiffs appealed.

"Counsel for defendants seek to make the point that the application for an appeal was from the judgment and not the order granting a new trial. There is no merit in the contention. The application for appeal and the affidavit in support thereof followed the language of the statute, Section 1471, Revised Statutes 1919, and referred to the matter appealed from, and by which appellants were 'aggrieved,' as the 'judgment and decision of the court.' We hold that to be sufficient.

"Counsel make the further contention that plaintiffs did not assign as error the sustaining of the motion in arrest, and that therefore the action of the trial court in that respect should stand. In their brief as originally printed, counsel for plaintiffs make an assignment of error as follows: "'The court erred in ruling that respondents' instruction in the nature of a demurrer to all the evidence in the case should have been sustained.' Later there were inserted in the brief the specific assignments that 'the court erred in sustaining the motion for a new trial, and erred in sustaining the motion in arrest of judgment.' But, at all events, counsel for appellants under the head of 'Points and Authorities,' and in their printed argument in beginning discussion of the several points constituting what they assert as error on the part of the trial court, made plain enough the matters relied on as constituting the error complained of, and upon that ground, as well as the grounds before stated, we rule the point against defendants. [Kirkland v. Bixby, 282 Mo. l. c. 462.]

"Upon the trial, the court over the objection of defendants, admitted testimony for plaintiffs—largely the testimony of plaintiff John T. Kennedy—as to the conversations between himself and Geo. E. Bowling, which took place before the signing of the contract. It appears that the lease, under which the company in which the plaintiffs were interested was occupying a building for its business, would expire on January 1, 1921, and plaintiffs were anxious to procure ground and erect a building to be ready for use on January 1, 1921,

and to be occupied by the John T. Kennedy Sales Company. Mr. Kennedy, upon suggestion of one of his associates, saw Mr. Bowling in the spring of 1920, and secured the services of defendants as real estate dealers, in finding a lot of ground which could be reached by a switch track. This was the first occasion when Kennedy and Bowling met. The defendants interested themselves in that behalf, and the ground mentioned in the written contract was purchased by plaintiffs, the title being placed in both of them. About the same time Mr. Kennedy took up with Mr. Bowling the question of the construction of a building upon the lot. Kennedy testified that upon the first occasion of their meeting, he told Mr. Bowling of the plan to put up a building for heavy chemicals and a storage warehouse of patent medicines, etc., and said he told Bowling he wanted to put up a concrete building, a heavy substantial concrete building; that in this and subsequent conversations he told Bowling it would be necessary for the floors of the building to sustain a load of 250 pounds to the square foot. He further testified that Mr. Bowling said that he was an experienced builder, and had put up business buildings for himself and for others; that his firm operated only on the commission basis, or cost-plus plan; that the construction of a building whose inside supports and structure was of concrete, was not practical at that time; that a building having its interior construction of mill work, that is, of wood interior, could be built more rapidly and at less cost. Kennedy said he told Mr. Bowling he expected to store heavy chemicals in the building, and would have to stack all the floors all the way up to the ceiling to make it pay. That Mr. Bowling said: 'When we get through you can put anything you want to in it.' He further testified that in discussing the matter, he and Mr. Bowling went and looked at several buildings which had been constructed by the Bowling firm, some for others, and one of them constructed by Mr. Bowling for himself; that Mr. Bowling in answer to his inquiry, assured him that a building of the character of his (Bowling's) building would be strong enough to carry the heavy stuff they were talking about, and that one of mill-work interior would be a suitable building for the purpose desired. The interior of the building belonging to Bowling was of mill-work construction. After these conversations, the defendants on August 30, 1920, delivered to Mr. Kennedy a proposal in writing to construct for him a three-story building and a one-story building, on the said lot for a commission of ten per-cent upon the cost, under which the Bowlings were to buy the materials and employ the labor to be used and superintend the work, and payment for the materials and labor was to be made by Kennedy from time to time as requested. They expressed in their proposal the belief that the building could be completed by the first of January,

following. This proposal, which was put in evidence by plaintiffs, and is in the form of a letter, said nothing about plans and specifications, but did propose that the architect's fee should be paid by the Bowlings. This offer was not accepted by Mr. Kennedy, and four days later, on September 3d, he prepared and delivered to the Bowlings his own proposal, the letter which has been heretofore set out in full. This proposal was accepted by defendants. Immediately thereafter defendants engaged an architect, and soon after that, Mr. Kennedy and Mr. Bowling went to the office of Mr. Braecklein, the architect, where Mr. Kennedy said he saw spread out in Braecklein's office blue-prints or drawings displayed on the table. He testified that the first thing he there said, was: 'Now, Mr. Bowling, I don't know any more about the plans of a building than I do about the inside of a watch.' I said, 'That looks all right.' He testified that he stated at that time to Mr. Bowling: 'I have never put up a building, and I have got to depend on you for the whole thing.' That Bowling replied: 'That is all right, Mr. Kennedy. You relieve your mind of all that sort of stuff. When the building is completed you will be pleased.' He further testified that he remained at the architect's office possibly thirty minutes; that he was never shown any plans nor any specifications of any kind about the building, except exhibits 4 to 11. These were the plans made by Braecklein. Exhibits 4 to 11 were introduced in evidence. They show the floor plans of the building, its front elevation, side elevations, and the form, size and general character of the proposed building, and the location of the doors, windows, etc. Along and upon the margin of the blue-prints showing the plans of the various floors of the building, there are figures showing in feet and inches the distances, and figures showing the dimensions of the supports, or mill-work construction of the interior of the building. On his cross-examination Mr. Kennedy said he did not remember whether he told Mr. Braecklein about the weight he wanted the building to carry or not; that he did not have much to say to Mr. Braecklein at any time on the subject of the building, but that he supposed Mr. Bowling had looked after that, and that he had explained to Mr. Bowling many times what he wanted. He said they decided on a mill-construction building; that he left that to Mr. Bowling. Asked as to what he meant when he said the plans were to be approved by him, he replied—'the general appearance of the building, where the elevators were going to be, the office, and all that sort of thing and the general lay out.' He said that he knew the words, 'plans and specifications to be furnished by you at your expense and approved by me,' were not in the letter from Bowling to him; that he did not know the meaning of that language, did not understand that he had the absolute power to ap-

prove or disapprove any plans that were submitted, but that he depended upon Mr. Bowling to look after everything; that after the letter was written, Mr. Bowling said he would have Mr. Braecklein draw up plans along the lines that they had talked, and when they were ready they would go out and look at them. The construction of the building was begun immediately after the visit to the office of the architect. Mr. Kennedy further testified that soon after the work was begun, and while the work of preparing the foundation was going on, he took up with Mr. Bowling the question of making the building a four-story building, and it was agreed between them that this would be desirable, as giving an additional amount of storage room at a less rate of expense. Mr. Kennedy said that at the time this project of adding another story to the building was under consideration, he told Mr. Bowling he wanted him to 'be sure and provide the foundations and columns strong enough to carry a four-story building, and so we can load it all the way up,' and that Bowling replied: 'Leave that to me. When the building is built, it will hold anything you want to put in it.' Mr. Kennedy said he was at the building every day or two, during the time it was being built; that he did not see the plans there, and made no request to see them during that time. Mr. Simson, associated with Mr. Kennedy in the business and called by plaintiffs, testified that Mr. Kennedy told Bowling they wanted a building of the same general character of construction as Mr. Bowling's building which they examined.

"Mr. Bowling testified that he had no discussion with Mr. Kennedy before he built the buildings as to the purpose for which they were to be used, but that Mr. Kennedy had stated at one or more times that he was going into the linseed oil business; that Mr. Kennedy never talked to him about the weight the building would carry until after the building was up, and they were putting the flooring down; that while they were nailing down the second floor Mr. Kennedy expressed some anxiety as to whether the building would be strong enough for him, and asked Bowling if he thought the building would carry 250 pounds to the square foot. Bowling testified that this was a surprise to him, as before that time Mr. Kennedy had said nothing to him indicating the importance of having a building which would carry heavy weight, and that he told Mr. Kennedy if he would load the building along the girders and leave the aisles open along the middle joists, he thought it would do so, but that Mr. Kennedy told him then, that he expected to put heavy stuff in the one-story building and on the first floor of the large building.

"The testimony for plaintiffs was that after the building was occupied and loaded, the floors began to sag and the timber gave indications of weakness—some of them split—and it became necessary to

strengthen and reconstruct the inside. This reconstruction was of steel.

"Plaintiffs had testimony tending to show that some of the timbers used were of inferior quality, and that they were not properly joined and fastened. The evidence, however, is clear that the fundamental cause of the failure of the building to support the load put upon it was not much from mere inferiority in the quality of materials, or workmanship, in respect of the particular materials used, but was due to the *kind* of materials used, and due to the fact that the supports were of wood, and were of a size and number such, that they were, for that reason, insufficient to withstand the weight.

"There is nothing ambiguous about the written contract into which the parties entered after the various conversations had by them. It does not require explanation to make clear its meaning, although Mr. Kennedy said he did not understand the meaning of the language he used, and did not know he could approve or disapprove plans offered. It states what each party was to do, but it was incomplete, in the sense that no description was given of the buildings to be constructed except that one of them should be of one story and the other of three stories, and the contract left the particular character of these buildings to be fixed by the plans and specifications for them, not drawn at the time the contract was signed, but thereafter to be furnished by defendants and approved by John T. Kennedy.

"In specifying that the building was to be constructed according to plans and specifications to be approved by himself, Mr. Kennedy reserved the right to reject plans and specifications which did not meet his wishes, or were not by him considered to be adapted to produce the result he desired. The plaintiffs' case, however, as presented here by counsel, is put upon the theory stated in that part of the petition heretofore set out literally. The theory is that the defendants undertook to construct a building sufficient for a known use, and that in lieu of specifications submitted to and approved by Mr. Kennedy, there was substituted the assurance made to plaintiff by defendants, accepted by plaintiffs in reliance upon the represented skill and knowledge of defendants, that a building of millwork interior after the manner of the building they had examined, a building of the character shown by the plans exhibited, would meet all the requirements. The theory, of course, must rest upon the premise that the evidence for plaintiffs is competent, and that it is to be taken as true. It must be taken as true in considering the ground on which the court sustained the motion for a new trial.

"As a general rule all oral agreements prior to a written contract are presumed to have been merged therein, and its terms become final, irrespective of previous oral talks or understandings. [Elliott v.

Winn, 305 Mo. 105, and cases cited.] It is also the rule that plans and specifications for a proposed structure, if not contained in the contract, but referred to therein or annexed thereto, when identified as such, must be construed therewith. [Evans v. Graden, 125 Mo. 72; McGregor v. Ware Construction Co., 188 Mo. 611; Burke v. Kansas City, 34 Mo. App. 570; Taylor v. Fox, 16 Mo. App. 527.] This contract by its terms contemplated the making of plans and specifications which, when approved by Mr. Kennedy, should become a part of the contract and be construed with the contract. The controversy is not over the plans, that is, over the blue-prints exhibited, showing the outlines, dimensions and general situation of the various parts of subdivisions of the building, but the claim is that no specifications were furnished or approved and in lieu of them and their approval were substituted the known desire of Mr. Kennedy and the assurance of the defendants that they would construct the building so as to fulfill his desire, and Mr. Kennedy's acceptance of that assurance. It is conceded that Mr. Kennedy knew the interior structure was to be of wood—mill work. There was nothing to show the particular kind of wood; but, as has been said, the blue-prints, produced here, contain along their margins figures indicating the location and dimensions of the timbers or supports, and the extent of the spaces intervening.

"The inquiry is necessarily directed to what occurred when the parties met, to consider plans and specifications, as contemplated by their contract. Mr. Kennedy did not complain that specifications were not furnished, or that the plans in the form in which they were submitted were lacking in definiteness or certainty in the requirement he says he had been making. He says he looked at them, but only as to the general outlines, or as he expressed it, the 'general layout,' and of that he said, 'It looks all right.' He states that conversation with Mr. Bowling thus: 'I said: "I don't know any more about plans than I do about the inside of a watch. I have never put up a building before. I know nothing about it. I have got to depend entirely upon what you say whether this is the kind of a building I want, and the kind of building that will take care of our business and is strong enough to hold the load." And Mr. Bowling said: "Now, Mr. Kennedy you need not worry about this sort of thing. I know the building business. I have been in it for years. Leave it to me, everything will be all right." '

"The foregoing was on his cross-examination. In his direct examination he stated the conversation as follows: 'I said: "Now Mr. Bowling, I don't know any more about the plans of a building than I do about the inside of a watch." I said: "That looks all right." As far as anything further goes, I said: "I don't know anything—absolutely nothing about that. I have never put up a build-

ing and I have got to depend on you for the whole thing.'' He said: ''That is all right, Mr. Kennedy. You relieve your mind of all that sort of stuff. When the building is completed you will be pleased and if you are not, I will make it right.' ' He testified also that at the time he saw the plans he did not know anything about the carrying capacity of the columns, girders, joists and anything of that kind.

''The testimony for defendants tended to contradict Mr. Kennedy's testimony upon almost all points. The testimony of the architect was that Mr. Kennedy and his associate, Mr. Simson, spent several hours at his office, with Mr. Bowling and his son, inspecting the plans, and 'checking everything up,' and said it was just what they wanted, and that Mr. Kennedy absolutely approved the plans.

''There are two questions presented upon the point under consideration. The first is that of the right of plaintiffs to show by parol evidence what was said by the parties, and next if such evidence be admissible, the question of the effect of what was said by them and the effect of their subsequent acts. The contract in writing clearly is one which not only provided for an additional agreement to be made, but required such additional agreement, to make it a complete and effective contract. The additional agreement was to be that which would definitely determine the character of the building to be constructed. That important thing determined, the other provisions of the written contract would apply to it, and the terms thus subsequently agreed upon would form a part of the original contract and be supported by the original consideration. If the additional terms agreed upon were reduced to writing, such writing would govern. If not reduced to writing, the parol-evidence rule would not apply to prevent introduction of extrinsic evidence with reference to the matters not fixed by the writing. [Reigart v. Coal and Coke Co., 217 Mo. 142; Davis v. Scovern, 130 Mo. 303; Quick v. Glass, 128 Mo. 320; Greening v. Steele, 122 Mo. 287; Black River Lumber Co. v. Warner, 93 Mo. 374; Brown v. Bowen, 90 Mo. 184; Koons v. St. Louis Car Co., 203 Mo. 255.]

''The defendants did· not furnish complete specifications, and Mr. Kennedy did not demand that they do so, nor, according to his evidence, did he undertake to pass upon their sufficiency for the construction of a building of the strength desired. Without more than what we have described, and following the conversation had at the office of the architect, the construction of the building was begun and went forward.

''The plaintiff had some·evidence to the effect that some of the timber supports were of an inferior quality, and that in some instances they were not joined in a workmanlike manner, but the essential cause

of the failure of the floors to sustain the weight put upon them was the plan or design of using timbers, of the size and number employed.

"The written contract provided for the taking of the steps by which the parties were to reach the agreement as to the kind of building to be constructed. Defendants' theory is that they proceeded by that method, that the character of the building was designated by plaintiffs, and it was constructed in the manner designated; and that plaintiff cannot recover merely because it was found not to be what plaintiffs desired or thought it was. The theory of the plaintiffs is that subsequent to the signing of the contract, when they came to fix definitely the character of the building and particularly its capacity to sustain a heavy weight, plaintiffs disclaimed any knowledge of what would be sufficient in that respect, or knowledge of the sufficiency and adaptability of the plans shown, and never approved plans or specifications, but that defendants represented themselves as possessed of knowledge and skill in that respect, and assured plaintiffs that a building constructed according to the plan suggested would fulfill the desired purpose, and that this statement was known to be false, or was affirmed without knowledge of its truth or falsity, and was accepted by plaintiffs as true. While the plans shown by exhibits 4 to 11 were of the character heretofore described, there is no direct evidence that Mr. Kennedy inspected them for the express purpose of determining their weight-carrying capacity, or understood the figures written upon the margin, or understood the weight-supporting capacity of the timbers there indicated. We know of no rule which would prevent the parties, at a time subsequent to the signing of the contract, from changing the conditions upon which they would act. Upon that ground the testimony as to what was said at the time the plans were exhibited was competent, and if true, it could be held to have effected a change in the terms of the written contract in this particular under consideration; and, because the contract left the conditions as to the character and strength of the building to be thereafter fixed, it was competent to show the circumstances under which the plaintiffs left to defendants the construction of the building in accordance with the plans shown, and under their assurance, that the building would answer the purpose desired. [Busch & Latta Paint Co. v. Woermann Construction Co., 310 Mo. 419, 276 S. W. 614.] That case was a suit for indemnity, but in the facts upon which original liability was placed it resembles in some respects the case at bar. The plaintiff in that case was under a contract to paint the interior of the Stock Exchange building and for that purpose needed a scaffold, adapted to the size and character of the building. The plaintiff applied to the defendant, a company engaged in the construction of scaffolds. The negotiations were car-

ried on by Mr. Latta for the plaintiff, and Mr. Martin, an engineer of the defendant. After the discussion between them, and as the result of the discussion, Mr. Martin drew a sketch of a scaffold which he said would suit the purpose. This was exhibited to Latta who answered that so far as he could see, it looked all right, but that he knew nothing about the carrying capacity and strains and he accepted the plan sketched, relying upon the skill of Mr. Martin as an engineer, and his assurance that the proposed plan would serve the purpose. On the following day, the defendant sent to the plaintiff its offer in writing to furnish the labor and materials for the building of the scaffold, according to its plans and 'as per verbal agreement of the 3d instant.' The scaffold was constructed in accordance with the plans, but it pulled apart and fell, injuring a workman. It fell because the parts were fastened with nails instead of bolts. In the opinion in that case the grounds of liability and the admissibility of the evidence was discussed as follows at page 434 (310 Mo.) :

" 'In the present case the defendants were engaged in the business of erecting scaffolds; had engineers skilled in that particular work. Mr. Latta in his testimony stated that he had built many scaffolds for the purpose of painting, but never one of the character required here. Mr. Martin rejected his suggestion about supporting towers. In response to Latta's expression regarding his own ignorance and his dependence upon Martin, because "you are the engineer," Martin said, "It can be done." Afterwards Martin produced his sketch, and Latta again expressed his lack of confidence in his own judgment: "I know nothing about the carrying capacities and strains." Thus he apprised Mr. Martin that he trusted to Mr. Martin's judgment as to what was necessary and what would be safe for the purpose. If the jury believed Latta's testimony, they properly could draw these conclusions: Martin knew the purpose for which the scaffold was to be constructed. He undertook to construct a scaffold suitable for that purpose. Latta accepted the sketch of the plan which Martin produced, because it was in accordance with Mr. Martin's judgment. While Latta got the definite article that the contract called for, according to the plans which he saw and approved, he did not make the plans; he did not suggest them; it was not a matter of selection; he took the plans which Martin tendered him with the understanding that Martin knew his business and knew that the structure, in accordance with the plan, would meet the purpose for which it was designed.

" 'Appellant claims that these conversations between Latta and Martin were not admissible in evidence, because the letter of September 4, 1919, was a written contract into which these prior negotiations were finally merged. This contention is unsound because the letter

does not purport to contain all the contract. Latta testified that they had already made their agreement before the letter was written, and the letter shows it because it begins: ''As per verbal agreement of the 3d instant.'' Even if the letter and the plans did constitute the entire contract, it was entirely competent for the plaintiff to prove the circumstances under which the contract was entered so as to show whether Mr. Latta trusted to his own judgment, or that of Mr. Martin, as to the sufficiency of the proposed scaffold. The letter has nothing to say about how the plans were selected or who proposed them. It was proper for the plaintiff to show how he came to take that particular plan for the scaffold; to show in fact that it was not a selection at all, but it was the only plan presented by Mr. Martin as suitable for the purpose; that Mr. Martin did not know anything about the capacities and strains of the scaffolding necessary for the purpose; and that he trusted to the defendant to produce a proper one for the purpose. It is not a modification of a contract to show the situation of the parties and the reasons for entering it. The evidence was competent.'

''It was found and stated in that case that while the defendant furnished his sketch showing the definite plan by which the structure was to be erected and plaintiff saw it, there was no evidence that the plaintiff's officer inspected it with an understanding of its quality. It was further held at page 441, that the 'plaintiff's acceptance of the plans presented did not conclude it as receiving what it bargained for, unless it understood what the drawing meant, or unless it understood the quality of the thing represented by the drawing.' In the case at bar the parol testimony was not in contradiction of the terms of the written contract, but the purpose was to show an actual subsequent change of that contract in respect to the manner of arriving at a final meeting of the minds of the parties, upon the question of the character of the building, a subject which the contract left open for later agreement and action between them. The plaintiff could have demanded full specifications, and taken thereon expert advice as to whether they projected a building such as they wanted, and defendants could have refrained from giving any assurance as to their sufficiency, and would have been under only the implied assurance that they would construct the building of the materials designated, and in a workmanlike manner; but, according to plaintiffs' evidence, they did not so proceed in completing the terms of their contract. According to plaintiffs' evidence defendants accepted the statements of plaintiff Kennedy that he knew nothing about the requirement for a building having the strength he desired, and defendants gave their assurance as experienced builders that the suggested and offered plans were sufficient for the purpose, and plaintiff acted

upon that assurance. The evidence was competent, and the question whether defendants undertook to construct the building for a known purpose, a building which would sustain the designated weight, was one for the jury. If they represented themselves as experienced and skillful in the construction of buildings and in the designs for such buildings and the plaintiffs relied upon their judgment, and defendants undertook the construction of the building, then the implied warranty arose that in design and workmanship the building should be reasonably fit for the purpose designated. [Busch & Latta Paint Co. v. Woermann Construction Co., supra; Smith v. Clark, 58 Mo. 145; Kellogg Bridge Co. v. Hamilton, 110 U. S. 108; Pump Co. v. Manufacturers' Automatic Sprinkling Co., 84 Mo. App. 204.]

"We hold that the trial court erred in ruling there was no evidence. upon which plaintiffs could go to the jury.

"Counsel for defendants have filed an additional abstract setting out the memorandum of the trial judge giving his reasons for sustaining the motion for a new trial. In our view, no inconsiderable part of the memorandum is taken up with discussion of the weight of the evidence, but the reason assigned of record, was not based upon the weight of the evidence.

"Counsel for defendants say there could be no recovery because the contract forming the basis of the action is in the name of John T. Kennedy, and was made by him individually, and his wife was in no way a party thereto, and that it would be a contradiction of the terms of the contract so to show. The petition alleges the purchase and ownership of the lot by plaintiffs, and pleads and sets forth the written contract, alleging that in all the transactions mentioned plaintiff John T. Kennedy was acting for himself and his cotenant, Mary B. Kennedy. The petition thus upon its face showed the status of the parties. The defendants did not demur to the petition, but in their answer they set forth the fact that at the request of John T. Kennedy they found the lot in question, 'a tract of switch property,' and that they 'acquired the title thereof for plaintiffs, which was taken in their joint names.' In their answer, also, defendants, referring to the written contract, alleged that it 'set forth the full agreement between plaintiffs and defendants.' In this state of the pleadings, under Sections 1226 and 1230, Revised Statutes 1919, defendants must be held to have waived the question of improper joinder of Margaret B. Kennedy as plaintiff. [Wilson Co. v. Hartford Fire Insurance Co., 300 Mo. l. c. 38.]

"In that opinion another rule immediately applicable is stated, at page 40: 'A contract made between two parties based upon a valid consideration, may be enforced by third parties when entered into for their benefit and that is true though such parties are not named

in the contract.' Numerous authorities upon both said questions are cited in the opinion.''

It is further suggested by respondents that the motion for a new trial should have been sustained for error in giving plaintiffs' Instruction 1. The instruction is as follows:

''The court instructs the jury that if you find and believe from the evidence that at the time mentioned in evidence plaintiffs were inexperienced in building operations and that defendants held themselves out as experienced builders and represented to plaintiffs that they had special skill and knowledge of the requirements for business buildings and the design and construction thereof, and that plaintiff's relied upon the skill and knowledge defendants represented themselves as having, and that the defendants knew the plaintiffs were so relying, if they did so represent themselves, and that plaintiffs were induced by such representations, if any, and their reliance thereon, if they did rely thereon, to engage defendants to furnish plans for and build and supervise the construction of the buildings described in evidence, and if you further find and believe from the evidence that plaintiffs made known to defendants that they intended to use the larger of said buildings for the storage of heavy chemicals and indicated to defendants the general character of the goods to be stored in such building and that a carrying capacity of 250 pounds per square foot was necessary, and if you further believe from the evidence that defendants undertook to build and supervise the construction of said building for plaintiffs suitable and sufficient for such purpose and assured plaintiffs that plans exhibited to plaintiffs and in evidence, provided for such building sufficient for such purpose, and that plaintiffs were unfamiliar with such plans and relied upon such assurance, if any, of defendants, and that defendants knew the same, and that defendants knew that such assurances, if any, were false or affirmed the truth of the same without knowledge of the truth or falsity thereof, and if you further find and believe from the evidence that after said larger building was commenced defendants assured plaintiffs and represented to plaintiffs that they could construct such larger building as a four-story building suitable and sufficient for the storage purposes above described and as aforesaid, and that plaintiffs relied on the skill and knowledge of defendants and their said representations and assurances, if any, and directed defendants to construct said building as a four-story building and that defendants thereupon proceeded to and did construct such larger building as a four-story building, and if you further find and believe from the evidence that said four-story building was imperfectly, unskillfully and defectively designed and constructed, and that defendants failed to use the skill and care in the supervision of ma-

terials used in said building that a reasonably experienced builder would ordinarily have used under the same or similar circumstances, and failed to use such skill and workmanship in the construction as a reasonably experienced builder would ordinarily have used under the same or similar circumstances, and that by reason of such defects and failures, if any, the building when completed was not sufficiently strong for storage of heavy chemicals, and did not have a carrying capacity of 250 pounds per square foot, and that by reason thereof plaintiffs were damaged, you will find the issues for the plaintiffs and assess their damages, if any, in the manner directed by other instructions given you by the court.''

The objections made to the above instruction are (a) that it is not warranted by the petition; (b) that it ignores the question of plaintiffs having approved plans or of the plans having been submitted to them for approval: and their then permitting the building to be erected under the submitted plans without objections; and (c) that it had the effect of permitting the written contract to be entirely altered by oral testimony.

We do not think the instruction is open to these objections. The gravamen of plaintiffs' complaint was that the building constructed was not sufficient to carry the weight incident to the purpose for which defendants agreed to construct it, and the allegation in the petition that plaintiffs ''at no time approved plans or specifications'' must be read in this light. The burden of defendants' answer and defense was that plaintiffs' letter dated September 3, 1920, and accepted by defendants, set forth the full agreement between the parties, and that the building was constructed according to plans and specifications approved by plaintiffs. Plaintiffs' reply was a general denial. On the issue thus framed and the evidence adduced instruction number 1 was given. We have already found that the agreement reflected by the letter of September 3, 1920, was incomplete. The plans submitted to plaintiffs are here in evidence as exhibits 4 to 11, both inclusive. They show the floor plans, the front and side elevations, the location of doors, windows, etc., and the form, size and general character of a three-story building, while the building actually constructed consisted of four stories. No specifications were submitted other than certain figures on these blue-prints showing in feet and inches the distance, and figures showing the dimensions of the supports, or mill-work construction of the interior of the building. Plaintiffs' evidence was that they were never shown any plans or any specifications of any kind about the building except exhibits 4 to 11 which were exhibited to plaintiff John T. Kennedy on a half-hour's visit at the office of the architect. Witness John T. Kennedy, testifying as to this visit, said that he looked the plans over from the

outside and they looked all right, but that was as far as he went, that he did not know anything about the carrying capacity of the columns, girders, joists or anything of that kind, that he told defendants of his lack of knowledge, inexperience and inability to pass on these things, and of his reliance upon their superior knowledge, skill and experience to construct a building sufficient for its intended use, which he had previously explained to defendants was that of storage of heavy chemicals requiring a carrying capacity of 250 pounds to the square foot, and that defendant George E. Bowling replied: "Don't worry about that sort of thing; leave it to me. When it is all complete, you will be pleased with it. If there is anything wrong, I will make it right." Defendants' version of what transpired on the examination of these plans is quite different from the foregoing in many respects, but Mr. Braecklein, the architect, testifying in behalf of defendants, said that while looking at the plans plaintiff John T. Kennedy chiefly talked about "the exterior part—that was the main part, how it was going to look outside. . . . Where the elevator was, and the freight train was going to bring the stuff in, and about his office, private office, and the girls,' and the dock—he accepted all that." There is no evidence that Mr. Kennedy inspected the plans for the purpose of determining their weight-carrying capacity, or understood the figures written upon the margin, or understood the weight-supporting capacity of the timbers there indicated; but on the contrary, there was substantial evidence, which we have already ruled was competent, tending to show that plaintiffs did not approve the plans in so far as the sufficiency of the strength of the proposed building for its intended use was concerned, but expressly relied upon the superior knowledge, skill and experience of defendants, and defendants expressly assumed that responsibility. Thereafter, it was agreed between plaintiffs and defendants that a four-story building should be constructed. Mr. Braecklein, the architect, testified that the foundations had been figured strong enough to carry the additional fourth floor, that they shoved the third floor up and used it as the fourth, and that he made a pencil drawing, showing how the fourth story would look by elongating the pilasters, and submitted it to Mr. Kennedy, "who liked the effects very much." Changes were made in the weight-carrying construction of the building after it was determined to make it four stories high, which were apparently never submitted to plaintiffs. The architect testified that "they fixed the columns," and, with reference to the columns and joists, defendant George E. Bowling, said: "Some were removed, and bigger ones put in." There is no evidence that plans and specifications for the four-story building that was actually constructed were ever submitted to plaintiffs for approval. Although plaintiffs con-

cede that John T. Kennedy did examine and approve the general effect of the three-story plans, and defendants' architect testified that he afterwards submitted a pencil drawing showing how the fourth story would look, it does not appear that defendants acted other than upon their own judgment and the judgment of their architect as to the weight-carrying construction of the building. We must consider this instruction with the foregoing background of pleading and evidence. The facts which the jury were required to find before they could return a verdict for plaintiffs were fully warranted by the pleadings and proof. The only character of approval involved in the case was whether or not plaintiffs approved the plans submitted in the sense that they assumed responsibility for the sufficiency of the strength or weight-bearing capacity of the building constructed, and this issue was necessarily and fairly submitted by this instruction.

Complaint is also made of instructions numbered 2 and 3 given at the request of plaintiffs, the grounds of complaint being that they assume that defendants undertook to erect the building for a particular purpose, and that they do not correctly state the measure of damages. Both of these instructions are on the measure of damages and therefore necessarily predicate a recovery by plaintiffs. In our opinion they contain no improper assumptions and correctly state the measure of damages.

Defendants further complain of the refusal of their instructions numbered 3, 4, 5, 6, 7 and 10. The first four were instructions withdrawing certain items of alleged damage from the consideration of the jury. Under number 3, the theory was that the boxes and house-traps connecting with the drain pipes and plumbing were cemented over; under number 4, that the elevator shaft should have been enclosed with brick; under number 5, that the guttering was placed on the outside of the fire wall so as to accumulate rainfall; and under number 6, that plaintiffs were not entitled to any damages on account of alleged loss of time and space by the John T. Kennedy Sales Co. It is conceded by defendants that there is some evidence upon these various points, and we think it was sufficient to require a submission to the jury. These instructions were properly refused. Instruction number 7 would have instructed the jury that "plaintiffs are not entitled to recover any damages on account of the claim that the building was not constructed sufficiently strong that the floors would carry two hundred and fifty pounds per square foot." This would have precluded the jury from considering evidence which we have held was competent, and therefore the instruction was properly refused. For the same reason instruction number 10, which sought to declare plaintiffs' failure to object to the plans

submitted and their failure to object to work done thereunder an approval of the same as a matter of law, was properly refused.

Respondents finally urge that their instructions numbered 11, 12, 13 and 4, were erroneously refused as offered, and erroneously given in a modified form. We have carefully examined these instructions and conclude that in the light of the evidence which we have ruled was competent the instructions were properly refused as offered and properly given as modified.

In their motion for a new trial defendants objected to certain remarks of one of plaintiffs' counsel in his closing argument to the jury, but this objection is not presented in respondents' brief and we treat the point as abandoned.

On the record, briefs and arguments presented here the order and judgment of the trial court sustaining defendants' motion for a new trial should be and the same is reversed, and the cause is remanded with directions to reinstate the verdict and judgment rendered for plaintiffs as of the date of the original judgment, with interest thereon from that date. All concur.