Carl A. RIBANDO and Leora Ribando,
Plaintiffs-Respondents,

v.

Thomas J. SULLIVAN and Theresa W.
Sullivan, Defendants-Appellants.

No. KCD 30170.

Missouri Court of Appeals,
Western District.

Sept. 4, 1979.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 1, 1979.

Milton W. Adams, John C. Theisen, Gordon, Adams & Gordon, Kansas City, for defendants-appellants.

Thomas R. Bellmann, Bellmann, Speck & Handley, Kansas City, for plaintiffs-respondents.

Before SHANGLER, P. J., WASSERSTROM, C. J., and CLARK, J.

WASSERSTROM, Chief Judge.

Plaintiffs purchased a lot on which defendants contracted to erect a house. Plaintiffs thereafter brought suit for damages arising from defects in the construction. A jury trial resulted in a verdict of $10,000 for plaintiffs. Defendants appeal.

The evidence shows that plaintiffs approached defendants, who were partners doing business as Sullivan Construction Company, for the purpose of having a house built on one of defendants' lots. Defendants showed the plans for a "Catalina" house, but that was not attractive to plaintiffs. Defendants then went to a designer and obtained plans for a "No. 4613" style house and showed those plans to plaintiffs, and defendants quoted a price to plaintiffs of $44,600 for the Catalina house and $43,975 for the No. 4613.

Plaintiffs were basically attracted to plan No. 4613, but did want a number of changes, the most important of which called for a one foot extension in the house on the bedroom side and four feet on the family room side. Other changes included such special items as two fireplaces, a cathedral ceiling in the dining room, a roughed in stool and lavatory in the basement and an inter-communications system. Agreement was reached with respect to these changes and a contract was signed on November 11, 1971, for a total price of $43,529.50. Under the terms of that contract, plaintiffs were to obtain commitment for a loan, and thereupon defendants were to deed the lot to plaintiffs and defendants were to proceed with the construction of the house with the features agreed upon.

The house was completed and plaintiffs took possession in June, 1972. They began noticing a number of defects which they called to defendants' attention, some of which were repaired by defendant. Many of plaintiffs' complaints, however, remained unsatisfied, and they arranged for the house to be inspected by Mr. Leon Maslan, an architect and also an engineer. Mr. Maslan made two inspections of the premises, one in March and the other in April, 1973, and thereafter he checked the house one more time to refresh his memory on February 11, 1978.

As a result of his inspection, Maslan identified a number of structural defects, principal among which were the following: the two big plates under the first floor were not bolted to the steel beams on which they rested, but were attached only with bent nails; the steel beams rested on wooden

posts to which they were not fastened and the wooden posts just referred to were not fastened to the concrete foundation; the main support for the floor joist under the first floor had been drilled into and thereby weakened and had not been properly nailed to the floor resting upon it; the concrete basement floor had been poured without expansion joints; the stair stringers had not been properly nailed; the exterior doors had not been sealed at the top and bottom; a light switch in a half-bath had been placed on the wrong side of the door; kitchen paper was loose; there was no putty around the kitchen sink and the sink was not bolted down; the wood paneling in the family room was loose and not properly nailed; the plywood floor was not nailed down in the bedroom hall; the door in the master bedroom did not fit properly and therefore dragged; there was no bracing in a bathroom cabinet; bedroom floors were loose; wall nails were popping out; flashing under the outside brick veneer was improperly placed so that it took water into the basement; a decorative brick wall in the front of the house was falling apart; some of the outside wood paneling was coming down; there were no splash blocks under the down spouts; one of the windows was in front of instead of behind a panel; and there was no sheeting or belting paper under the exterior siding. Maslan's conclusion was that the house had been built in a defective manner, the workmanship was not quality construction and the house was not of reasonable quality. There was additional testimony that the air conditioner installed had only a three and one-half ton capacity instead of the four ton capacity specified in the agreement.

With respect to the amount of damages, Mr. Ribando testified "I think it's twenty or twenty-five thousand dollars that it would take to fix all them things—to have all the leaks and the foundations fixed, and stuff. * * * If I have to dig out that yard and get in that foundation, and if I have to have this basement resealed—and I don't know what I'd have to do to, you know, get the different things fixed around there. * * I'd just like to have a sufficient amount of money for my trouble and agony and worry in fooling with this house to get these things fixed and repaired in the home, and live in it like I want to. And twenty, twenty-five thousand, I think would be sufficient enough to try to get everything straightened out. * * * " He admitted on cross-examination that he was not a contractor and had no idea about construction labor rates nor about the costs of construction materials.

The only other evidence offered by plaintiffs with respect to their damages was the testimony of Mr. Albert L. Margolin, a real estate expert. Margolin testified that the fair market value for the house at the time of trial was $50,000, that its fair market value without the defects would be $66,000, so that the diminution in fair market value was $16,000. He testified that these calculations were made by him as of 1977, updated to the date of trial in 1978, and that he did not compare his calculations at all to the value of the property in either 1972 or 1973.

Defendants' Points Relied Upon may be summarized as follows: (1) that plaintiffs' submission to the jury on theory of breach of contract constituted a departure from the petition which pleaded breach of warranty, and that plaintiffs did not prove a breach of contract; (2) that the damage instruction was not supported by any proper evidence; (3) that certain photographic exhibits were improperly admitted because not properly identified; (4) that said exhibits were improperly admitted because they were taken five years after the alleged breach of contract; (5) that the verdict is excessive; (6) that the verdict is so excessive as to show bias and prejudice; and (7) that the trial court should have sustained defendants' motion for directed verdict.

I.

A discussion of the issues raised by the above points will be greatly clarified by starting with an examination of the nature of defendants' responsibility and their consequent legal liability. In *Smith v. Old Warson Development Company*, 479 S.W.2d

795 (Mo. banc 1972),. Missouri adopted for the first time the doctrine that a builder-vendor of a new house becomes liable under an implied warranty of habitability. The applicability of that leading decision was thereafter distinguished in *Barrett v. Jenkins,* 510 S.W.2d 805 (Mo.App.1974) and *O'Dell v. Custom Builders Corporation,* 560 S.W.2d 862 (Mo. banc 1978), both of which declare that the new *Old Warson* doctrine applies only to the sale of a completed new house, and has no application to a contract with respect to a house to be built. As pointed out in *O'Dell,* the latter situation does not require the invocation of any new doctrine, because the common law as it existed prior to *Old Warson* clearly recognized that one who contracts to build a house impliedly warrants and it becomes a condition of the contract that the contractor will perform the construction work in a reasonably workmanlike manner. This long standing legal obligation upon one who contracts to build a house is well recognized by Missouri cases. *Kennedy v. Bowling,* 319 Mo. 401, 4 S.W.2d 438 (banc 1928); *Freeman Contracting Company v. Lefferdink,* 419 S.W.2d 266 (Mo.App.1967); *Pitzer v. Hercher,* 318 S.W.2d 397 (Mo.App.1958). That this constituted the well established law pertaining to construction contracts even before the onset of the new doctrine of implied warranty of habitability which was adopted in this state by *Old Warson,* was recognized by the numerous law review articles cited in *Old Warson.* Roberts, *The Case of the Unwary Home Buyer: The Housing Merchant Did It,* 52 Cornell L.Q. 835, 838 (1967); Bearman, *Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule,* 14 Vand.L.Rev. 541, 571 (1961); Byrd, *Property—Implied Warranty of Fitness in the Sale of a New House,* 71 W.Va. L.Rev. 87, 88 (1968); Haskell, *The Case For an Implied Warranty of Quality in Sales of Real Property,* 53 Geo.L.Rev. 633, 637 (1965).

■ The present case is one in which the defendants entered into a contract to build a house. This case is therefore controlled by the old, well established doctrine of an implied warranty or condition of good workmanship which existed prior to *Old Warson* and still exists independent of the new doctrine of implied warranty of habitability.

## II.

Attention can now be directed to defendants' first Point on Appeal concerning the alleged departure in plaintiffs' legal theory. Defendants argue that plaintiffs attempted to plead a cause of action under the theory of implied warranty of habitability (as declared in *Old Warson*), and tried their case on that basis. Defendants further state in their brief that at the close of the evidence a conference was held with respect to instructions and that the trial court refused to instruct on implied warranty of habitability in reliance upon *Barrett.* Defendants proceed to say that plaintiffs thereupon submitted an instruction on the theory of breach of contract, which instruction was accepted and given by the trial court.

Nothing with respect to that instruction conference, alleged by defendants to have taken place, appears in the transcript. Regardless of whether such a conference and ruling by the trial court did occur, that cannot be material to a resolution of the issues on appeal. The question presented by defendants' first assignment of error is whether plaintiffs' pleading was sufficient to present a breach of contract theory and whether the evidence adduced supported that theory. We conclude that plaintiffs' pleading and proof in that respect was sufficient.

■ Plaintiffs' first amended petition (shown in the transcript as the First Amended "Complaint") does contain some language reminiscent of the *Old Warson* opinion. Nevertheless, the allegations of the petition are consistent with and support the theory of breach of warranty of an implied warranty or condition of good workmanship.[1] Even if the allegations of

1. The pertinent allegations of the petition in this respect are as follows:

"5. That defendants were contractors for the construction of said home and installed or

the petition could be said to be insufficient, those allegations must be deemed to have been amended under Rule 55.33 to conform to the evidence, particularly to the testimony given by Maslan.

Maslan's testimony has already been summarized and it will be seen that Maslan undertook to describe in considerable detail the violations of good workmanship committed by defendants. Not only did Maslan's testimony in this regard come in without objection, but defendants joined issue by introducing counterevidence to the effect that their construction methods had conformed to customary standards of good workmanship. This record compels the conclusion that the parties have tried the issue of good workmanship by consent, regardless of whether it was completely and accurately pleaded. Furthermore, Maslan's testimony was amply sufficient to warrant submission of that issue to the jury.

### III.

For their second Point, defendants contend that plaintiffs have not proved damages, in that all of plaintiffs' evidence on this issue related to the value of the house in 1977, rather than its value in the year of completion, 1972. Defendants' contention in this respect is correct and requires reversal.

■ The basic rule of damages in this situation is that plaintiffs are entitled to whichever is lower, as between the cost of repair and the diminution of value (diminution meaning the difference in value of the house if it had been constructed properly

compared with its actual value as constructed.) MAI No. 4.02 and the Notes on Use thereunder; *Sands v. R. G. McKelvey Building Co.*, 571 S.W.2d 726, 732 (Mo.App. 1978). In measuring the value of the house as completed, the value must be ascertained immediately after the breach of the contract. *DeArmon v. City of St. Louis*, 525 S.W.2d 795, 800[7] (Mo.App.1975); *Hotchner v. Liebowits*, 341 S.W.2d 319, 322 (Mo. App.1961). So, the controlling date for evidence as to the value of plaintiffs' house as constructed had to be June, 1972.

■ The only evidence addressed by plaintiffs with respect to damages was the testimony of plaintiff Carl Ribando and the expert witness Margolin. Ribando's testimony was extremely vague and lacking in sufficient foundation to give it probative value. In any event, his testimony as to damage cannot be given effect because he testified as to a cost of repair in the range of $20,000 to $25,000, which was in excess of the diminution in value figure given by Margolin. Margolin's testimony also fails to satisfy plaintiffs' burden of proof, because his appraisal was made as of 1977, five years after the house was completed. He firmly disclaimed taking any account of value in either 1972 or 1973. Accordingly, none of plaintiffs' evidence satisfies the legal standard of proof as to the value of the house on date of breach.

However, the failure of proof in this regard unquestionably occurred simply by reason of a misunderstanding of the applicable legal rule and plaintiffs should be

directed and controlled the construction and installation of the framing and support structures, basement and foundation, interior wall, cabinet and plumbing fixtures, carpeting, central vacuum system, central air conditioning, door locks, electrical wiring and other general construction work.

"6. That shortly after plaintiffs took possession of said home, the basement leaked, floor joists were left unfastened, the floors began to settle, the carpet was loose and unfastened, the interior wallpaper came loose, doors and cabinets were unfinished, windows were uncaulked, the oven failed to properly operate, and the air conditioner and vacuum systems

were insufficient to perform their respective tasks.

"7. That all the items described in paragraph 6 above are defects in construction, and such defects were latent defects, of which plaintiffs were not capable of discovering by careful inspection.

"8. That the defects made the home one not of reasonable quality or of reasonable fitness for use as a home.

"9. That defendants have breached their implied warranty of merchantable quality and fitness, by representing and offering for sale, and selling said home with the above mentioned defects."

given an opportunity by a new trial to introduce proper evidence directed toward value of the house as it was and as it should have been at the time of breach, June 1972, or the cost of repairs as of that date. Inasmuch as this case will be retried as to damages, defendants' Points V and VI need no attention.

### IV.

■ One of defendants' assignments of error is that their motion for a directed verdict should have been sustained. It has already been held under Point III of this opinion that plaintiffs failed to submit proper proof of damages. However, that is not to say that there was no evidence in the case showing that they did suffer at least some damage. For example, the evidence is uncontested that defendants installed a three and one-half ton air conditioner instead of the four ton air conditioner promised. Furthermore, even one of defendants' witnesses admitted that some repairs were required to correct defendants' faulty construction and still remain to be done. Hence, plaintiffs' failure to prove its full amount of damage cannot stand as sufficient reason for saying that a verdict should have been directed against them.

### V.

Because of the faulty evidence regarding damages, this case must be remanded for new trial, but the question occurs whether the new trial should be limited to the question of damages only. The issue of whether or not defendants were guilty of defective workmanship has already been fully developed and settled by the jury, and there would be no reason to retry that issue unless it could be because the admission of certain photographs was error and such error prejudicially tainted the jury's finding of defective workmanship.

The problem about photographs arose in the following manner. The first witness to testify on plaintiffs' behalf was Maslan. He testified at length as to his examination of the house in 1973 and used in that connection a number of black and white photographs which he had taken at that time. Then, during the course of his examination, plaintiffs' counsel asked Maslan about certain color photographs. When asked by defendants' counsel about these latter photographs, Maslan stated that they had not been taken by him and that he could not say when or by whom the photographs had been taken. Defendants then objected to these photographs, but the objections were overruled. Later, during the testimony of plaintiff Leora Ribando, it developed that the color photographs had been taken in 1978, three or four weeks before trial.

■ Defendants now argue that the color photographs should not have been introduced because they did not depict the condition of the house as it existed immediately after the breach. That, however, was not the nature of the objection made by defendants at trial. Their objections then went only to the matter of identification,[2] and the objections were voiced only when the pictures were offered through Maslan. When some of these same pictures were reoffered and others of the same group were offered through Leora Ribando, not only was there no objection made by defendants, but their counsel stated affirmatively time after time, "No objection." Under these circumstances, defendants have waived their objection made during the testimony by Maslan and carried forward on appeal as Point III, and they cannot now raise the additional different objection presented in their brief on appeal as their Point IV.

Upon retrial, the challenged color photographs should not be used.

2. A fair example of defendants' objections at trial is as follows: "MR. ADAMS [defendants' counsel]: Mr. Maslan, did you take these photos? THE WITNESS: No. MR. ADAMS: Do you know when they were taken? THE WIT- NESS: No. MR. ADAMS: Your Honor, we'll object to the introduction of these exhibits, 40 and 43, for the reason this witness cannot identify the time or place of the taking of these pictures."

**126**

## VI.

One final matter, although not raised by defendants, should be mentioned so as to avoid error upon retrial. The question of damages was submitted to the jury in this case under MAI No. 4.01. The use of that form was inappropriate and erroneous. Upon retrial the issue of damages should be submitted under MAI No. 4.02. *Sands v. R. G. McKelvey Building Co., supra.*

The judgment is reversed and the cause remanded for a new trial on the issue of damages only. Costs will be assessed against the plaintiffs.

All concur.