**William O'DELL and Eileen O'Dell, Plaintiffs-Respondents,**

v.

**CUSTOM BUILDERS CORPORATION, Defendant-Appellant.**

**No. 60062.**

Supreme Court of Missouri, En Banc.

Jan. 9, 1978.

Rehearing Denied Feb. 8, 1978.

James J. Sauter, Deeba, DeStefano, Sauter & Herd, St. Louis, for defendant-appellant.

William W. Eckelkamp, Jenny, Cole & Eckelkamp, Union, for plaintiffs-respondents.

FINCH, Judge.

Plaintiffs obtained a verdict and judgment against Custom Builders Corporation (CBC) for $19,000 for breach of an implied warranty that house plans prepared for

plaintiffs were fit for use in construction of a house on property owned by plaintiffs. The asserted deficiency in the plans was that they failed to provide for needed piering to support footings on which foundation walls were constructed, resulting in extensive settling, cracking, and other damage to plaintiffs' house. CBC appealed to the Missouri Court of Appeals, St. Louis District, which affirmed. That court's opinion relied in part on a recent decision of the Missouri Court of Appeals, Kansas City District, in a case subsequently transferred to this court for decision. We ordered this case transferred and we now decide it as though here on direct appeal. Mo.Const., art. V, § 10. We affirm.

In the spring of 1972, plaintiffs, then residents of Baldwin in St. Louis County, decided to build a home on a tract which they owned near Pacific in Franklin County. They began to look for plans and were attracted by an advertisement of CBC which proclaimed that it was qualified to design and build fine homes throughout the St. Louis area. Plaintiffs visited CBC's offices and conferred with its president, Mr. McGinnis. They told him of their plans, explaining that their property fronted on the Meramec River and they wanted to place their house at the crest of the slope which overlooked the river. McGinnis showed them a number of basic designs which could be adapted to meet their desires. They selected one and told McGinnis of the changes which they wanted incorporated.

McGinnis conveyed this information to a CBC draftsman who then prepared four pages of blueprints of the proposed house. The front page, bearing the legend "Custom Designed Especially for Mr. and Mrs. William O'Dell," indicated that these plans were prepared in May 1972 for a house for plaintiffs at Pacific, Missouri. Page one gave the front elevation of the house. The back and two side elevations were shown on page four. Page two gave a detailed floor plan for the main (upper) floor and page three, captioned "Foundation Plan," gave the floor plan for the lower (basement) level.

In addition to preparing the blueprints, CBC prepared a contract which plaintiffs and CBC executed on May 25, 1972. It was headed "Specifications of Residence for Mr. & Mrs. Bill O'Dell, 226 Victor Ct., Baldwin, Mo. 63011 to be erected in Indian Hills, Franklin County, Missouri." It then set out on the first four pages the building material specifications for the house shell structure which CBC was to build. Page five then provided:

"PURCHASER, ACTING AS HIS OWN GENERAL CONTRACTOR, ASSUMES THE RESPONSIBILITY FOR THE CONSTRUCTION, MATERIALS AND/OR INSTALLATION OF AND FOR THE FOLLOWING ITEMS WHICH ARE NOT INCLUDED IN THIS CONTRACT AND ANY OTHER ITEM NOT SPECIFICALLY MENTIONED:

| | |
|---|---|
| Permits | Air Conditioning |
| Painting | Electric |
| Driveways | Insulation |
| Sidewalks | Drywall |
| Tar | Flooring |
| Drain Tile | Tile and/or Underlayment |
| Bath Fixtures | Cabinets |
| Chrome Bath Accessories | Built-Ins |
| Medicine Cabinets | Vanities |
| Floor and Wall Tile | Finish Carpentry |
| Finish Grading | Brick |
| Cleaning-up | Doors and Trim |
| Excavation | Garage |
| Foundation | Carport |
| Garage Concrete | Porch |
| Basement Floor | Basement Windows |
| Flat Concrete | Aeration |
| Plumbing | Septic Tank |
| Heating | |

"ANY ASSISTANCE GIVEN BY CUSTOM BUILDERS CORPORATION DOES NOT CONSTITUTE ANY LIABILITY ON THE PART OF THE SELLER.

"CUSTOM BUILDERS CORPORATION is not responsible for doors and trim not painted within 15 days."

The front and back of the sixth page contained nineteen printed provisions, the last of which provided a contract price of $11,-112 for the work to be done by CBC. Page six obviously was a standard sheet regularly incorporated in contracts made by CBC. In addition, CBC furnished plaintiffs with its written estimate of costs on the various items which CBC was not to perform.

Although no written agreements were introduced, it appears that plaintiffs also entered into a contract whereby all subcontractors were to be paid by Westoak Investment Company acting as escrow and disbursing agent. Westoak was located in the same building as CBC and Mr. McGinnis also was president of it. Under the arrangement each subcontractor would submit bills directly to plaintiffs who then would approve them and authorize payment by Westoak by a voucher whereby a lien release was obtained.

Not long after the contract was signed, Mr. O'Dell called CBC and inquired about what was being done on the construction of his house. CBC then arranged for its employee Schultheis to meet O'Dell at the site and stake out the house. When they met at the site, O'Dell showed Schultheis where the property lines were and the general area where he wanted the house placed. Schultheis then used the plans to stake out the precise measurements to locate and orient the house in accordance with O'Dell's general description.

Sometime thereafter, Mr. O'Dell visited the site where the house was to be built. He discovered that excavation for the house had been commenced and was about 90 per cent complete. The work was being done by Thomas Conn whom O'Dell then met for the first time. Although O'Dell recalled that at the time he thought that Thomas Conn worked for CBC, in fact Thomas Conn was doing business as Conn Brothers Excavation and plaintiffs subsequently paid a separate bill and obtained a lien release for the excavation from this company.

When O'Dell arrived that day, he also met for the first time Jack Conn who, with a couple of other men, was making core drills to blast away some rock which had to be removed so the excavation work could be completed. Jack Conn, d/b/a Jackson Excavating and Construction Co., had been contacted by CBC to do the blasting and also to lay the foundation. When he so informed O'Dell, the latter gave him the plans he had received from CBC for the foundation. Again, although O'Dell apparently was not aware of the lack of any legal relationship between CBC and either of the Conn brothers, he did subsequently authorize payment to Jackson Excavating for foundation work and a separately stated charge for blasting.

Jack Conn proceeded with the blasting and subsequently poured the footings and foundation walls as shown on page three of the blueprints. Part of the footings rested on rock and part on dirt, some of which was new fill placed by the excavator Thomas Conn to fill in low areas at the front of the house. Jack Conn testified that he had no knowledge of the fill because he had arrived at the site after the fill was already in place.

Construction progressed to completion, CBC performing the work for which it had contracted, and other subcontractors, arranged for by plaintiffs, doing the other work. They were paid pursuant to the arrangements made between plaintiffs and Westoak.

Soon after plaintiffs moved in, they began to notice evidence of uneven settling of the house. Doors would not close and posts supporting the deck began to shift and even fall off. This situation progressively worsened to the extent that the foundation, walls and fireplace cracked, the fireplace separated from the walls, water leaked in and damaged the lower bedroom, the deck of the house listed four to five inches, the sliding glass doors fell off the hinges if unlocked, and wind, insects and even a flying squirrel entered through the cracks. Eventually, it was determined that the foundation on the side of the house facing the river had settled approximately four inches. Mr. O'Dell called CBC and Jack Conn. CBC took no action but Conn came out and did several things to try to rectify the situation, including using metal jacks, pouring some concrete and placing some concrete blocks, but these gave only limited relief.

Finally, plaintiffs brought suit against Jack Conn, later amending to add CBC as a defendant. Their second amended petition was in three counts but they submitted only

on Count III which charged breach of an implied warranty of fitness of design by CBC and breach of an implied warranty of fitness of the foundation as constructed by Jack Conn. The jury returned a verdict in favor of Conn but against CBC. Only CBC appealed. For that reason we do not consider on this appeal the case as it pertained to plaintiffs' claim against Conn. We also do not discuss the evidence relating to the extent of plaintiffs' damage because no issue is raised as to the amount of the verdict.

At the trial plaintiffs produced an expert witness who testified that the settling of the house was caused by a faulty foundation design. He stated that where, as here, a house is constructed partly on rock and partly on dirt, some of which is new fill, there should be piers resting on rock which support the footings on which the foundation is placed. Defendant Conn also testified that a house built partly on rock and partly on new fill would not stand up without proper piering but said that he had not known that part of the house was on new fill. He testified that he built the foundation, including the footings, as shown on the plans prepared by CBC.

As previously noted, plaintiffs sought to recover from CBC for breach of an implied warranty of design for a particular use. Their theory was that CBC as part of its contract with them sold the design of a house for use on a particular tract owned by plaintiffs on the Meramec River; that plaintiffs reasonably relied on CBC's judgment as to the fitness of the design of the house for such use; that in fact the design was not fit for that site and hence for that use; and that plaintiffs were damaged as a result when the foundation settled and the house cracked.[1]

CBC first contends that it was entitled to a directed verdict, saying that a warranty of fitness for a particular use may not be implied in law when, as here, it is contrary to the express terms of the contract between the two parties. CBC does not contend that it did not sell the plans to plaintiff. Rather, it says that no warranty may be implied because the contract and plans show that plaintiffs were to act as their own general contractor, that CBC was only to build the shell structure of the house, that other subcontractors arranged by plaintiffs were to do all the other work including excavation and construction of the foundation and that CBC had no responsibility for the foundation or plans therefor. In this role CBC views itself as providing plans which include a basic foundation design only incidentally to its function of constructing the shell structure.

In support of its argument on this point, CBC first refers us to certain express provisions of the contract which it contends are inconsistent with an implied warranty as asserted by plaintiffs. It points out that on page 1 of the contract the specific undertaking of CBC is to "lay shell work according to plan and be responsible for same." It then contends that page 5 of the contract, *supra*, establishes that this was the only obligation assumed by CBC because the purchaser as general contractor assumed responsibility for the "construction, material and/or installation" of other specifically listed items including the foundation and excavation work.

The foregoing provisions in the contract are not inconsistent with the implied warranty which plaintiffs assert. The contrac-

---

1. The theory of plaintiffs' submission was embodied in Instruction No. 3, its verdict-directing instruction against CBC, which was as follows:

"Your verdict must be for the plaintiffs and against the defendant, Custom Builders Corporation, if you believe:

"First, defendant, Custom Builders Corporation sold the design of the house to plaintiffs, and

"Second, the defendant Custom Builders Corporation knew or should have known by using ordinary care of the use for which the plaintiffs purchased the design of the house, and

"Third, plaintiffs reasonably relied upon defendant Custom Builders Corporation's judgment as to the fitness of the design of the house for such use, and

"Fourth, the design of the house was not fit for such use, and

"Fifth, as a direct result plaintiffs were damaged." MAI 25.03 (Modified)

tual provisions as to the shell work addressed only CBC's obligations regarding the construction it was to perform. The provisions on page 5 whereby plaintiffs assume responsibility for construction, installation and materials of the items other than the shell work might well be read to preclude plaintiffs from charging CBC with failure of a subcontractor to construct those other items including the foundation in a workmanlike manner or to use the proper materials. However, those provisions do not charge plaintiffs with the responsibility for obtaining additional plans for the foundation or inform them that such action might be necessary. Nor do the cited provisions constitute a disclaimer by CBC of the sufficiency of the foundation plan provided for use on plaintiffs' lot.

CBC next relies on paragraph 5 on page 6 which provides:

"Purchaser assumes responsibility of location of the construction as indicated by Purchaser at the time of staking out of house. Purchaser warrants Seller that such location is within the legally defined limits of his title to the premises, and agrees to indemnify and hold harmless Seller against all claims or losses, direct or consequential, arising from any breach of the above warranty, including any attorney's fees."

That provision merely establishes responsibility of plaintiffs for making certain that the site staked out is within the property lines of plaintiffs' property. It does not relate to whether plans for the house provided by CBC are adequate for that particular site and is not inconsistent with an implied warranty of fitness.

■ The next contractual provision relied on is paragraph 15 on page 6 which provides:

"This bid is subject to checking contour of land, and if there is any piering or rock, the purchase price does not include piering or excess rock removal, but such charges shall be charged to Purchasers."

This section has the effect of notifying the owner that if on checking the site where the house is to be built a need for excavating rock or piering develops, the cost thereof is to be extra expense chargeable to the owner. It alerts plaintiffs that estimates for excavation and foundation will increase if rock removal or piering proves to be necessary. However, paragraph 15 does not purport to and does not have the effect of saying that plans prepared by CBC need not make provision for piering if the site is such that piering is required for the house design to be adequate.

■ The final provision in the contract relied on by CBC as being inconsistent with an implied warranty of fitness of the plans for a particular purpose is paragraph 16 on page 6 which provides:

"There are no promises, agreements or understandings other than those contained in this purchase contract, and no agent or salesman has any authority to obligate Seller by any terms, stipulation or conditions not herein expressed. In the event that any changes or extras shall be reduced to writing and signed by the Purchaser and Seller." [Sic]

This paragraph was directed at protecting against perhaps overly ambitious statements or promises by a sales representative in attempting to secure a contract with a prospective buyer, not at eliminating warranties implied as a matter of law.

■ In further support of its position that a verdict should have been directed, CBC argues that the contract provisions, the plans furnished and the surrounding circumstances all demonstrate (1) that CBC had no reason to know that plaintiffs would rely on and use the plans for construction of the foundation without further checking and modification as necessary and (2) that plaintiffs' reliance on the plans as being sufficient for the foundation on that particular site was unreasonable. In addition to relying on the express contractual provisions, CBC points out that the location specified on the plans simply said Pacific, Missouri, that the plans were drawn before any personnel from CBC had visited plaintiffs' property or had any information about its soil characteristics or requirements and that this was made evident by the fact that the

plans simply gave an assumed grade with reference to the house and its foundation. Under these circumstances, says CBC, plaintiffs knew that the plans had been prepared without any site data being available to CBC and, therefore, plaintiffs could not expect that the plans furnished were sufficient without additional checking and adaptation by them, if necessary, for particular soil conditions encountered on their property.

We conclude and hold that the above factors relied on by CBC do not establish as a matter of law that CBC could not have known that plaintiffs would rely on and use the plans for construction of the foundation without further checking and modification as necessary nor that it was unreasonable for plaintiffs to rely upon the plans as being sufficient for construction of the foundation and footings on this particular site. We so conclude for several reasons.

In the first place, the details shown on the foundation plan which appeared on page three of the blueprints were such that the jury reasonably could find therefrom that plaintiffs were entitled to rely on those plans as being sufficient and that CBC could have anticipated that they would so rely. That plan gives construction details, showing that three foundation walls were to be 7'7" high and were to be 8" thick and were to be poured on 8" × 20" footings. It also calls for footings 3'4" × 7'0" × 12" under a fireplace and chimney. In addition, the back and side elevations of the house on sheet four recite that the foundation walls are to be 8" concrete. The plans also show piers to be installed to support the posts on which the deck was to be constructed. These directions and dimensions were there for some purpose and, absent some instruction or caveat to the contrary, would reasonably be deemed to be there to be followed. No directions to the contrary were given. Nowhere on these plans is there any statement to the effect that the "Foundation Plan" is not really intended as a foundation to be constructed or that plaintiffs as general contractors must make other arrangements for an adequate foundation plan. There is no statement that plans

cover only the house shell which CBC is to build. Nor is there any caveat on the plans that this foundation plan was prepared without knowledge of the site and that piering may be necessary, particularly if there is fill, or that plaintiffs should take steps to determine whether piering is necessary.

The recitation on the plans that they reflected an "assumed" grade may have indicated, as CBC contends, that there would be a need to modify the plans to meet conditions encountered if the assumed grade was inaccurate and fill became necessary but that does not indicate which party was to determine whether modification was necessary. Even if the plaintiffs were aware of the need for further checking, the contract did not assign responsibility to them and they might reasonably have assumed that CBC would perform this function because it had provided the plan. Plaintiffs had no expertise in home design or of the need for such things as core drilling, piering, etc. They looked for house plans to be furnished by someone else and were attracted to CBC by its advertisements which proclaimed its expertise in designing and building fine homes. This expertise as designers was repeated on the letterhead on which page one of the contract was written. The plans themselves stated on the front page that they were "Custom Designed Especially for Mr. and Mrs. William O'Dell" for their property at Pacific, Missouri. These plans were clearly a major part of the inducement for plaintiffs to deal with CBC rather than retain an architect and then subcontract the shell work as well as the other items to be performed. We conclude that a reasonable construction of the contract and plans was that CBC, the party holding itself out as an expert in design and providing the design, would determine the necessity for modification of the design and make any changes necessary. Because the contract was somewhat ambiguous on this point, the subsequent action by CBC in sending Mr. Schultheis to stake out the property and then arranging for the Conns to do the excava-

tion and begin work on the foundation was highly relevant in determining the reasonableness of plaintiffs' reliance on CBC to make any necessary modification of the foundation design as the need appeared. Thus, whether CBC should have known of the particular use for which the plaintiffs would use the plans and whether plaintiffs' reliance on the plans as being fit for the use intended was reasonable were questions for the jury.

■ In further support of its argument that a verdict should have been directed, defendants cite.and rely on our decision in *Smith v. Old Warson Development Co.*, 479 S.W.2d 795 (Mo. banc 1972), saying that it permits recovery for breach of an implied warranty only against a person who had an opportunity to observe a structural defect but failed to correct the same which then became latent. Such opportunity in this case, says CBC, belonged to the subcontractor who built the foundation, Jack Conn, not CBC. Plaintiffs also rely on our decision in that case as establishing the basis for their verdict-directing Instruction No. 3, *supra*, fn. 1. Actually, as discussed subsequently, *Old Warson* is inapplicable to the situation involved in this case.

In *Old Warson* we held that a common law warranty of habitability or quality will be implied in law in the sale of a new home by a builder-vendor so as to protect the purchaser against latent structural defects. Although the court's discussion therein of the claimed implied warranty used the terms "fitness," "quality," "merchantability" and, ultimately, "habitability" interchangeably, it is clear that the warranty imposed in *Old Warson* on the builder-vendor was closely analogous to that found in § 400.2–314,[2] which is therein termed "implied warranty of merchantability." The citations in *Old Warson* to *Morrow v. Caloric Appliance Corp.*, 372 S.W.2d 41 (Mo. banc 1963), and *Hays v. Western Auto Supply Co.*, 405 S.W.2d 877 (Mo.1966), fully docu-

mented its premise that this warranty existed at common law and was recognized by our courts as to products prior to codification of the doctrine which became effective in 1965.[3] Actually, the comments to § 400.-2–314 expressly state that the section was drawn from developing case law and is designed to permit further, more expansive interpretation as necessary.[4] Essentially, both the common law warranty and the statutory codification thereof may be said to require that the product be reasonably fit for the ordinary purposes for which it is used.[5]

It is apparent, then, that the primary significance of *Old Warson* lies not in its recognition of the warranty of merchantability but in its extension of the warranty by analogy to the sale of a completed new home. This analogy was based on judicial recognition of the nature of such a sale. As the court stated at 799:

> " 'Although considered to be a "real estate" transaction because the ownership to land is transferred, the purchase of a residence is in most cases the purchase of a manufactured product—the house. The land involved is seldom the prime element in such a purchase, certainly not in the urban areas of the state. . . .' "

The other matter of particular significance in *Old Warson* is the fact that the court, after noting that the common law doctrine of merger of a sale contract into a deed sometimes has been the basis for denial of warranty recovery in the purchase of a completed house, rejected that doctrine in that case by recognizing the tort nature of the implied warranty on which recovery was permitted.

Plaintiffs' claim is not directed against CBC as a builder-vendor nor as a seller of a house. It is predicated on the sale of the design of the house. It is not contended that the plans sold were unmerchantable. Rather, they seek recovery on the basis that

**2.** All statutory references are to RSMo 1969 unless otherwise noted.

**3.** Laws 1963, p. 637, § 10.101.

**4.** Sec. 400.2–314, comment *Purposes* and comment 6.

**5.** *See* § 400.2–314, comment 8.

they were not fit for use on the lot where plaintiffs were to build. Their theory as set forth in their instructions is based on MAI 25.03—Breach of Warranty of Fitness for Particular Use. Fitness for a particular use is a separate concept from that of merchantability or, in the case of a new home, habitability. Therefore, *Old Warson* is inapplicable to this case.

Permitting recovery by plaintiffs herein requires no modification of the common law, such as was necessary in *Old Warson*. Previous Missouri cases have recognized a distinction between implied warranties in contracts to design and build and contracts to sell completed homes. *Kennedy v. Bowling*, 319 Mo. 401, 4 S.W.2d 438 (banc 1928), addressed a closely analogous situation. There the plaintiffs contracted with defendants to construct a four story building on plaintiffs' property. They related their requirements to the defendants who employed an architect to draw specifications for the project. After the contract was signed, plaintiff related to defendants that the floors of the building would have to be capable of sustaining heavy weights because of plaintiffs' intention to store heavy materials there. Defendants represented that the building would be sufficient for the purpose but subsequent use of the completed building proved otherwise. In analyzing the defendants' liability the court stated the applicable rule, 4 S.W.2d at 445:

"According to plaintiffs' evidence, defendants accepted the statements of plaintiff Kennedy that he knew nothing about the requirement for a building having the strength he desired, and defendants gave their assurance as experienced builders that the suggested and offered plans were sufficient for the purpose, and plaintiff acted upon that assurance. The evidence was competent, and the question whether defendants undertook to construct the building for a known purpose, a building which would sustain the designated weight, was one for the jury. If they represented themselves as experienced and skillful in the construction of buildings and in the designs for such buildings, and the plaintiffs relied upon their judgment, and defendants undertook the construction of the building, then the implied warranty arose that in design and workmanship the building should be reasonably fit for the purpose designated. *Busch & Latta Paint Co. v. Woermann Construction Co.*, supra [310 Mo. 419, 276 S.W. 614]; *Smith v. Clark*, 58 Mo. 145; *Kellogg Bridge Co. v. Hamilton*, 110 U.S. 108, 3 S.Ct. 537, 28 L.Ed. 86; *United States Wind, Engine & Pump Co. v. Manufacturers' Automatic Sprinkler Co.*, 84 Mo.App. 204." [6]

Numerous other cases recognizing implied warranties in contracts to build are collected in *Hoye v. Century Builders*, 52 Wash.2d 830, 329 P.2d 474 (1958). In that case the Supreme Court of Washington found little difficulty in holding that an experienced builder who provided plans for construction of a house on a lot selected by plaintiffs warranted the sufficiency of the plans provided and that structure would therefore be fit for the purpose in view.

The only distinguishing characteristic between *Kennedy* and the present case is that the builder in *Kennedy* not only furnished the plans but built the entire structure as well. However, as indicated by the above quotation, the liability imposed was for the failure of the plans supplied to provide for adequate support in the structure and not on the failure of the builder to erect the structure in accordance with the plans. Accordingly, we hold that plaintiff here presented sufficient evidence from which a common law warranty for a particular purpose may be inferred. The court properly overruled CBC's motion for a directed verdict.

**6.** *See also Hotchner v. Liebowits*, 341 S.W.2d 319 (Mo.App.1960) (builder providing specifications held liable for breach of implied warranty that building would be constructed in a skillful and workmanlike manner where cracks appeared as a result of insufficient footings); *Pit-* *zer v. Hercher*, 318 S.W.2d 397 (Mo.App.1958) (builder liable for breach of implied warranty for construction in skillful and workmanlike manner where frame improperly positioned on foundation); 17A C.J.S. Contracts § 329, p. 293.

CBC next asserts that Instruction No. 3, plaintiffs' verdict director against CBC, was prejudicially erroneous. First, it was erroneous because the implied warranty claimed by plaintiffs did not exist. CBC's brief says that this was so for all of the reasons urged in support of its claim that a verdict should have been directed in its favor. For the same reasons we advanced in holding that CBC was not entitled to a directed verdict, we hold that there is no merit to this attack on Instruction No. 3.

■ CBC next complains that Instruction No. 3 was erroneous because it directed the jury to return a verdict against CBC if the jury found that CBC sold plaintiffs an unfit "house design." This, says CBC, gave the jury a roving commission to construe "house design" in any manner desired whereas the plaintiffs' evidence was limited to alleged deficiency in the design of the foundation.

We reject this contention. Instruction No. 3 conforms to MAI 25.03 which directs that in paragraphs Second and Third of the instruction the article or property purchased be described. That is what plaintiffs did. They purchased a set of plans for the house, one page of which described the foundation and footings. Plaintiffs were not directed by MAI 25.03 to describe in the instruction some particular portion of the article purchased at which their complaint was directed. What plaintiffs did in this case is in harmony with what plaintiffs did in their verdict-directing instruction in *Old Warson*. In that case plaintiffs complained about two rooms in the house they had purchased. Those rooms were constructed on a four-inch concrete slab which was surrounded by but not attached to the foundation walls of the house. The slab settled, causing damage for which recovery was sought. Plaintiffs' evidence was that settling of the slab was the result of insufficient compaction of the soil. However, plaintiffs' verdict-directing instruction submitted to the jury the question of whether the *residence* was reasonably suited for the use intended, not whether the *two rooms* complained of were suitable. Similarly,

plaintiffs in this case submitted whether the house design purchased by plaintiffs was fit for the use intended. Although we can conceive of more specific formulations which would have adequately described the subject of the complaint, there could not have been any prejudice here because the evidence left no doubt as to the conduct of CBC of which plaintiffs were complaining and for which they sought to hold CBC liable.

■ Next, CBC complains that the instructions to the jury were in an order which prejudicially emphasized liability of CBC. This complaint is directed at the fact that (1) the verdict-directing instructions as to CBC and Jack Conn (Instructions Nos. 3 and 4) were given in reverse order to the way the parties are named in the petition and (2) CBC's converse instruction (Instruction No. 7) was separated from the verdict-directing instruction against CBC by the verdict director against Jack Conn, the measure of damage instruction and the instruction defining ordinary care.

We find no error in the manner in which these instructions were placed before the jury. Wide discretion is vested in the trial court to determine the order of the instructions. "Except where otherwise provided in Missouri Approved Instructions, they shall be given in such order as the court shall deem advisable." Rule 70.01(d) V.A. M.R. Where there is a prolix maze of instructions and issues the better procedure would seem to require that a converse instruction appear in relatively close proximity to the instruction it converses, but no provision of Missouri Approved Instructions requires that it follow immediately. See MAI 33.01–33.13. In this case with few and uncomplicated instructions, no prejudicial error resulted from the placement of the converse instructions.

■ Similarly, there is no requirement that the order of the verdict directors conform to the order in which the parties were named to the suit. CBC's assertion that MAI 35.03 mandates a contrary result is unpersuasive. That set of instructions, which serves as an illustration for use in a

three car chain collision suit, makes no reference to the order in which the parties were named but merely refers to them as Driver No. 1, Driver No. 2, and Driver No. 3, listing the verdict-directing instructions in that order. It can by no means be viewed as a mandate that verdict directors be given in the order the parties are named in the suit. Here the petition and each verdict-directing instruction sought to hold each defendant liable for the entire amount of the damages regardless of the liability of the other. The instructions did not in any way imply that one defendant was more culpable than the other or that one should be excused if the other was liable. Defendant was entitled to no more and we therefore find no prejudice.

■ CBC's final allegation of error is that Instruction No. 5,[7] governing the measure of damages, was erroneous because it made reference to a single occurrence causing injury to plaintiffs while the verdict-directing instruction against the two defendants specified two separate occurrences, i. e., faulty design[8] and faulty construction.[9] CBC alleges that reference to a single occurrence in the measure of damages instruction confused the jury and contributed to the verdict of liability on the part of only one of the two defendants.

The Notes on Use accompanying MAI 4.01 state that "[t]he word 'occurrence' should be adequate except in cases where there is evidence that two different occurrences produced the injury with defendant being responsible for only one. In such cases counsel will need to substitute some

descriptive term which will properly limit the jury to the occurrence produced by defendant." It appears that defendant has confused "occurrence" as it is used in MAI 4.01 with differing theories of liability of separate defendants for the same occurrence. In this case, the occurrence mentioned in the evidence was the lack of proper piering of the portion of the house which rested on fill. The jury might find one, both or neither of the defendants responsible for the lack of proper support based on the conduct of each individual defendant as set forth in the separate verdict-directing instructions against them. Only after determining that either or both defendants were liable to plaintiffs under the verdict-directing instruction would the jury consider the measure of plaintiffs' damages— in this case, all damages resulting from a failure to provide proper support for the structure.

The illustration of instructions contained in MAI 35.03 is closely analogous to the situation presented here and often presented where there are multiple defendants. It hypothesizes a suit against three defendants involved in a three car collision where three separate negligent acts are charged in three separate verdict directors. However, the measure of damages instruction is MAI 4.01 unmodified. This is because there is only one occurrence mentioned in the evidence. The occurrence is the accident itself which plaintiff claims caused injury. The occurrence clearly could have been produced by the acts of any, all or none of the defendants. However, if any or all are found to have caused the occurrence, the

---

7. "If you find the issues in favor of the plaintiffs, then you must award the plaintiffs such sum as you believe will fairly and justly compensate the plaintiffs for any damages you believe they sustained as a direct result of the occurrence mentioned in the evidence." MAI 4.01 (Modified)

8. See note 1, *supra*.

9. Plaintiffs' verdict-directing instruction against defendant Conn provided:

"Your verdict must be for the plaintiffs and against the defendant, Jack Conn, if you believe:

First, defendant Jack Conn sold the foundation of the house to plaintiffs, and

Second, defendant Jack Conn knew or should have known by using ordinary care of the use for which the plaintiffs purchased the foundation of the house, and

Third, plaintiffs reasonably relied upon defendant Jack Conn's judgment as to the fitness of the foundation of the house for such use, and

Fourth, the foundation of the house was not fit for such use, and

Fifth, as a direct result plaintiffs were damaged." MAI 25.03 (Modified)

The characterization of this instruction as submitting faulty construction is defendant's.

plaintiff's recovery is the same and is measured by those injuries sustained in the accident regardless of the number of defendants found liable.

The only case cited by defendant in support of its allegation is *Homm v. Oakes*, 453 S.W.2d 679 (Mo.App.1970). That case properly held that the damage instruction was prejudicially erroneous where the evidence indicated plaintiff had suffered serious injuries in successive accidents only a month apart but did not limit the jury's consideration of the amount of the award to injuries incurred in her collision with the defendant. Obviously, this case involved two separate occurrences and is not analogous to the case now before us. We find no error in the submission of Instruction No. 5.

The judgment is affirmed.

All concur.