**Kidd G. SNOWDEN, Appellant,**

v.

**Laura S. GAYNOR, Respondent.**

No. 14226.

Missouri Court of Appeals,
Southern District,
Division Two.

May 20, 1986.

Randy P. Schuller, Hackworth and Schuller, Piedmont, for appellant.

Cynthia A. Goforth, Robert M. Ramshur & Assoc., P.C., Piedmont, for respondent.

CROW, Judge.

On August 6, 1983, Kidd G. Snowden ("plaintiff") and Laura S. Gaynor ("defendant") entered into a "Sale Agreement" by which plaintiff agreed to sell, and defendant agreed to buy, for a price of $15,500, a house and lot in Wayne County. Defendant, pursuant to the agreement, made a $1,300 down payment, and, with her two young children, took possession. Regarding the balance of the purchase price, the agreement provided:

> "$300.00 to be paid the 6th of each month. Beginning the 6th of Sept. 1983 through March 6, 1984. Beginning April 6, 1984 payment will be $200.00 per month until paid in full. Interest 14%."

Defendant made the required payments through June, 1984, but none thereafter. Plaintiff ultimately filed a two-count petition. Count I sought a declaration that the agreement was "null and void," together with an order for possession of the property. Count II sought judgment for "the monthly value of the rent"—said to be $200 per month—from and after July 7, 1984.

Defendant responded with a two-count counterclaim, Count I thereof "sounding in fraud," and Count II "being under implied warranty of habitability."

Trial by the court without a jury produced a judgment that, under Count I of plaintiff's petition, plaintiff was entitled to possession. On Count II of plaintiff's petition, the court found in favor of defendant and against plaintiff. On Count I of defendant's counterclaim, the court found in favor of plaintiff and against defendant. On Count II of defendant's counterclaim, the court found in favor of defendant and against plaintiff, awarding defendant $1,300 damages. Costs were taxed equally.

Plaintiff appeals from the judgment against him on Count II of defendant's counterclaim. He does not appeal from the denial of any of the relief he unsuccessful-

ly sought in his petition. Defendant did not appeal.

Plaintiff's brief presents two assignments of error. The first is that the trial court erred "in that the implied warranty of habitability is applicable only to the sale of a completed new house and the house in question was neither." The second is that the trial court erred in calculating the damages awarded defendant, in that even if there were a breach of warranty, defendant was entitled only to "the cost of repair or the diminution of value, whichever is lower."

Our review is governed by Rule 73.01(c), Missouri Rules of Civil Procedure (17th ed. 1986), and *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Credibility of witnesses and the weight to be given their testimony is for the trial court, *Estate of Graves*, 684 S.W.2d 925, 928[2] (Mo.App. 1985); *Mills v. 1st National Bank of Mexico*, 661 S.W.2d 808, 810[1] (Mo.App.1983), which is free to believe none, part or all of the testimony of any witness. *Lee v. Rolla Speedway, Inc.*, 668 S.W.2d 200, 206[8] (Mo.App.1984); *Lohrmann v. Carter*, 657 S.W.2d 372, 377 (Mo.App.1983). We assume the trial court believed the testimony and evidence consistent with its judgment, *Paramount Sales Co., Inc. v. Stark*, 690 S.W.2d 500, 501[3] (Mo.App.1985); *McComas v. Umlauf*, 641 S.W.2d 809, 812[5] (Mo.App.1982); consequently, we accept as true the evidence and permissible inferences which may be drawn favorable to the prevailing party, and disregard the contradictory testimony. *Mills v. Cameron Mutual Insurance Co.*, 674 S.W.2d 244, 246–47[2] (Mo.App.1984); *Cusumano v. Outdoors Today, Inc.*, 608 S.W.2d 136, 139[5] (Mo.App.1980).

So viewed, the evidence establishes that the house was built by plaintiff on a lot he owned in a subdivision he was developing. For the house's frame, plaintiff used the frame from a "double wide mobile home" that had burned. Plaintiff situated the house on a hillside, supporting the frame by piers of stacked concrete blocks resting on cement footings. Atop the piers, between the concrete blocks and the frame, plaintiff placed "pieces of wood that had been cut out of trees"; consequently, the frame lay on the wood, not on the concrete blocks. When defendant looked at the house before signing the contract, there was no "skirt" between the bottom of the house and the surface of the ground, thus defendant was able to see the concrete block piers. She did not, however, see the wood blocks atop the piers.

There was no carpet on the living room floor, which was made of "particle board" that, according to defendant, "looked like it was new." Defendant quoted plaintiff as saying that the house was new, that he had built it, and that he knew it was built "good and right." Defendant conceded that plaintiff informed her there was no insulation in the living room ceiling. Furthermore, said defendant, she realized she would have to get "underpinning" installed between the bottom of the house and the ground.

Several weeks after defendant took possession, a crack developed around a door where "you can see light around it." Other problems ensued, including (1) a gap at the top of the sliding glass doors at the front of the house, (2) a "separation" in an interior wall between the kitchen and a bedroom, beginning about halfway up the wall and extending to the ceiling, and (3) a separation between the kitchen cabinets and the ceiling.

Additionally, the roof over a back bedroom began "sagging in," and an electric "baseboard heater" in the living room shorted out and "smoked that wall up" when the baseboard shifted, cutting the heater's wiring.

On top of these difficulties, defendant recounted that on three occasions the sewer pipe leading from the trailer to the septic tank had "come apart." Plaintiff's son repaired it twice, but the third time the two sections could not be forced back together,

thus there was sewage draining under the house.

Defendant's evidence showed that water running down the hillside flowed beneath the house in such volume that it was "washing the foundation out from under it."

James Raymond Roach, a homebuilder with 25 years' experience, testifying as a witness for defendant, explained that he examined the house on February 20, 1985, and concluded that the footings were insufficient to hold the house. Roach could tell that the house had "shifted" because the block piers were tilted, and he had "seen some movements in the beams that was set on the blocks." He noted that the cement footings were sinking into the earth, and that they had not been set below the frost line. This, according to Roach, made the footings susceptible to movement caused by the "thaw and freeze cycle." Erosion from the runoff down the hillside further undermined the footings. It was the instability of the footings that was allowing the house to shift, which was the source of all the trouble.

In Roach's opinion, the pier construction would not have been acceptable to anyone in the construction trades.

Defendant, a widow in her early twenties at the time she signed the agreement, testified she had never before purchased a house, and that she knew nothing about construction.

▆ In *Smith v. Old Warson Development Co.*, 479 S.W.2d 795 (Mo. banc 1972), it was established that in Missouri, an implied warranty of habitability exists in favor of one who is the first purchaser of a new home from a builder-vendor. In the instant case, as observed earlier, plaintiff contends *Old Warson* is inapplicable, in that the home he sold defendant was neither new nor completed. In support of his position, plaintiff cites *O'Dell v. Custom Builders Corp.*, 560 S.W.2d 862 (Mo. banc 1978), and *Barrett v. Jenkins*, 510 S.W.2d 805 (Mo.App.1974). Neither aids him.

In the latter case, the Barretts employed an architect to prepare plans and specifications for a home. The Barretts then entered into a contract with Jenkins, a contractor, to build the home on a lot Jenkins owned. A year after the home was completed, the Barretts sent Jenkins a list of complaints, which eventually formed the basis for a suit by the Barretts against Jenkins in which the Barretts based their claim on the theory that Jenkins had breached an implied warranty of fitness. A $10,000 judgment for the Barretts was reversed on the ground that *Old Warson* was inapplicable. In explaining why, the opinion pointed out that unlike the purchasers in *Old Warson*, the Barretts did not buy a completed home which, because of a latent defect, was unfit for use as a residence. Jenkins' obligations to the Barretts were fixed when he contracted to build the home in a workmanlike manner according to the plans and specifications supplied by the Barretts. Jenkins' obligations did not spring from an implied warranty of fitness that arose when he deeded the completed home to the Barretts. *Barrett*, 510 S.W.2d at 807. Thus, the Barretts misconceived their remedy, which had to be based on Jenkins' alleged breach of his contractual obligation. *Id.*

In *O'Dell*, the owners of a tract of real estate decided to build a house thereon. They contacted Custom Builders Corp. ("CBC"), which prepared blueprints and specifications for the structure. CBC then contracted with the owners to build the "house shell." Items for which CBC was *not* to be responsible included excavation and foundation. After the house was completed and the owners had moved in, they began to notice evidence of "uneven settling" of the house. Eventually, it was determined that the foundation on one side had settled approximately four inches. The owners sued CBC, obtaining judgment for $19,000 for breach of an implied warranty that the plans were fit for use in constructing the house. The flaw, said the owners, was that the plans failed to provide for needed piering to support footings on which foundation walls were constructed,

resulting in the settling. One of CBC's contentions on appeal was that *Old Warson* permitted recovery for breach of an implied warranty only against a person who had an opportunity to observe a structural defect but failed to correct the same, which then became latent. CBC argued that such opportunity belonged to the subcontractor who built the foundation, not CBC. The opinion held that *Old Warson* was inapplicable, inasmuch as the owners' claim was not directed against CBC as a builder-vendor or as a seller of the house, but was instead predicated on the sale of the *design* of the house. Fitness of the blueprints for use in constructing the house on that particular site (a slope overlooking a river) was a separate concept from implied warranty of habitability. *O'Dell*, 560 S.W.2d at 870–71. Judgment for the owners was affirmed.

It is readily apparent that the instant case is unlike *Barrett*, in that here, plaintiff did not contract with defendant to build the house from plans furnished by defendant. Here, the house had already been built by plaintiff before defendant ever met him. The instant case is also unlike *O'Dell*, in that here, defendant bases her claim on plaintiff's alleged breach of an implied warranty of habitability of the *house*, not on breach of an implied warranty of fitness of the *plans* from which the house was built. As the instant case is controlled by neither *Barrett* nor *O'Dell*, we must return to *Old Warson* to determine whether defendant's judgment against plaintiff on Count II of her counterclaim is sustainable on the theory of breach of an implied warranty of habitability.

In maintaining that no such warranty arose here, plaintiff relies heavily on the contention that the house was not "new." He directs our attention to his testimony that he began building it in the "fall" of 1982, and that "some people lived in it all the winter before she bought it." Plaintiff also insists that the house was not "com-

pleted" when defendant contracted to buy it. He reminds us that there was no carpet in the living room, and that there was no insulation in the living room ceiling. Additionally, says plaintiff, the footings and foundation were incomplete, and the lot was "unlandscaped."

There is no dispute about the absence of carpet in the living room, or the lack of insulation in the ceiling. However, we reject plaintiff's contention that the footings and foundation were incomplete. We are mindful that plaintiff testified he told defendant that cement blocks were needed "around the whole part of the house," and we have likewise noted plaintiff's testimony that defendant said she had friends who could help do that on weekends. The trial court, however, was not obliged to believe plaintiff's testimony on that point, and presumably found it unconvincing.

True, defendant realized, when she signed the agreement, that the house needed underpinning, but underpinning is a far different item than footings and foundation.

Plaintiff, in arguing that the house was not completed, asserts that defendant wanted him to "cosign" a loan so that she could "finish the house."[1] That, however, is an unfair characterization of defendant's testimony.

Defendant testified that after it became evident that the foundation was insufficient, she asked plaintiff to "cosign" a loan so that she could obtain materials and try to "get the foundation up to par." Nothing in defendant's testimony supports plaintiff's contention that defendant, at the time she signed the agreement, was told that the footings and foundation were incomplete. The trial court could have reasonably found, and inferentially did, that when defendant signed the agreement she assumed the foundation was complete and was adequate to support the house, and that her later effort to obtain the loan—when it became apparent that the foundation was giving way—was an attempt to

---

**1.** We infer that plaintiff never deeded the property to defendant, thus a lender would have insisted that a deed of trust securing a loan to defendant be signed by plaintiff.

correct the defect before it became catastrophic.

As to the absence of landscaping, we fail to see how that would render the house incomplete. Many houses are purchased before landscaping is done, and the buyers do the landscaping themselves, or contract professional landscapers to do it. If, by landscaping, plaintiff means moving earth in order to divert the runoff away from the house, there is nothing in the record to support a contention that defendant realized when she signed the agreement that this would be necessary to protect the foundation against undermining.

We do not read *Old Warson* as requiring that, at the time the first purchaser contracts to buy a new house from the builder-vendor, the last nail be driven *or* the final coat of paint be dry in order that the buyer be afforded the protection of an implied warranty of habitability. Indeed, we find in *Old Warson* this passage:

> "There is some dispute in the testimony as to whether the house was completed at the time the contract was signed. We find it unnecessary to resolve such conflict." 479 S.W.2d at 797.

We hold that the absence of carpet on the living room floor, the dearth of insulation in the ceiling of that room, the lack of underpinning around the bottom of the house, and the absence of landscaping did not deprive defendant of an implied warranty that the house was habitable.

We likewise reject plaintiff's contention that no warranty of habitability can be implied inasmuch as the house was not "new" when the parties signed the agreement. It is undisputed that plaintiff built the house on land he owned, and that defendant was the first person who contracted to buy the house from plaintiff. The fact that several months elapsed from the time plaintiff built the house until defendant signed the agreement does not, in our opinion, mean that the house ceased to be "new" within the meaning of *Old Warson*.

The rationale of *Old Warson*, as we perceive it, is that the builder-vendor of a house has an opportunity, during construction, to observe a structural defect and correct it before further construction conceals it. He who is the first purchaser of the house from the builder-vendor has neither the opportunity nor the expertise to detect such a defect. If, after a house is built, it sits unsold for several months, we see no logic in denying the first purchaser an implied warranty of habitability. It is common knowledge that houses built on speculation (as this one obviously was) often sit unsold for weeks, or even months. It would be absurd to hold that the first purchaser of a new house who buys it the day it is finished is protected by an implied warranty of habitability, while the first purchaser of a new house who buys it after it has sat unsold for several months enjoys no such protection.

We similarly find no merit in plaintiff's thesis that the house lost its "new" character, for implied warranty of habitability purposes, because some people lived in it during the winter while it sat unsold. That does not change the fact that plaintiff built the house or the fact that defendant was the first person who contracted with plaintiff to buy it. The risk of latent defects, so far as defendant was concerned, was the same whether or not the house had been occupied during part of the time that plaintiff was offering it for sale.

Neither party requested findings of fact or conclusions of law, and the trial court filed none. In such circumstances, all fact issues are deemed found in accordance with the result reached, and the judgment must be affirmed under any reasonable theory supported by the evidence. *Montrose Savings Bank v. Landers*, 675 S.W.2d 668, 669[2] (Mo.App.1984); *Elliott v. West*, 665 S.W.2d 683, 689–90[4] (Mo. App.1984). Applying that principle, we find the evidence sufficient to support a holding that under the *Old Warson* rule, an implied warranty that the house was habitable arose in favor of defendant when she contracted to buy the property from plaintiff, and that the warranty was breached when the footings and foundation

proved not to be of reasonable quality, allowing the house to shift and sustain damage.[2] Plaintiff's first assignment of error is, accordingly, denied.

Plaintiff's second point asserts that the trial court erred in calculating the damages awarded defendant. Plaintiff contends that even if there were a breach of warranty, defendant was entitled only to the "cost of repair" or the "diminution of value," whichever is lower. By "diminution of value," we understand plaintiff to mean the difference between the actual value of the property at the time the agreement was signed, and what its value would have been at that time had the footings and foundation been of reasonable quality.

*Major*, 618 S.W.2d at 296[4], squarely holds that in an action for breach of implied warranty of habitability, the measure of damages for breach of such warranty is the difference between the value, at the time of the sale, of the house as warranted and of the house as it was sold, or the cost of remedying the defect, whichever is lower. *Major* cautions, however, that if the builder-vendor, after notice of the defect, takes action which does not remedy the defect, but alleviates its consequences, that action should be considered in arriving at the damages. *Id.*

A departure from the *Major* rule on damages is found in *Stegan v. H.W. Freeman Construction Co., Inc.*, 637 S.W.2d 794 (Mo.App.1982). There, the home buyers presented evidence that the defect (a water line which froze because it was not buried deeply enough) caused them to be without water for 20 days, required the wife and three children to move in with relatives, precipitated plumbing expenses in an effort to restore service, and resulted in expenditures for laundry, meals, and other items. Additionally, the husband took some vacation days from his job while trying to remedy the problem. Affirming a $2,500 judg-

ment for the buyers, the court held that the buyers' damages were not restricted to the difference between fair market value before and after the occurrence plus compensation for loss of use (MAI 4.02). *Id.* at 798.

In the instant case, defendant, in Count II of her counterclaim, did not pray for damages of the type in *Major* or the type in *Stegan*, nor did she present evidence of damages of either type. Instead, defendant sought to recover (a) the amount of her down payment, $1,300, (b) the aggregate of her monthly payments, allegedly $2,175, and (c) the sum of her expenditures for carpeting and drapes. Defendant, in short, wanted damages that would restore her to the position she occupied prior to the transaction, in effect giving her the benefit of a rescission of the agreement.

■ It is obvious, of course, why defendant sought that relief. She ceased making payments to plaintiff after June, 1984, and when the cause was tried on February 21, 1985, defendant manifested no desire to proceed with the purchase. Thus, unlike the buyers in *Major* and *Stegan*, defendant would not retain the property after trial. Indeed, the trial court, by awarding possession of the property to plaintiff on Count I of plaintiff's petition, effectively terminated the purchase agreement.[3] Defendant, as previously noted, did not appeal, thus plaintiff's right to possession of the property is now conclusively established.

The result is that defendant, according to her testimony, has paid plaintiff $3,475 ($1,300 down and $2,175 in monthly installments), and has expended a total of $293 for carpeting and drapes, yet has nothing to show for it. She did, of course, have the use of the property from the time the agreement was signed until the trial court awarded possession to plaintiff. On that score, the judgment was filed February 28,

---

**2.** The fact that defendant and her children inhabited the house for some time while the disintegration intensified does not defeat defendant's cause of action for breach of implied warranty of habitability. *Major v. Rozell*, 618 S.W.2d 293, 295–96 (Mo.App.1981).

**3.** As explained in footnote 1, *supra*, we infer that plaintiff never deeded the property to defendant.

1985, and it ordered defendant to surrender possession within seven days.

Plaintiff, emphasizing that the trial court did not recite how it arrived at the $1,300 damages awarded defendant, insists that the award must be viewed as either arbitrary or as a rescission of the agreement with a return of defendant's down payment to her. The latter, says plaintiff, would be "relief not pleaded nor requested."

While it is true that Count II of defendant's counterclaim did not mention rescission by name, it is equally true that the damages prayed for therein were the type awarded when rescission is decreed. Furthermore, defendant's testimony about the amounts she had paid plaintiff and the amounts she had expended for carpeting and drapes was received without objection. Under Rule 55.33(b), Missouri Rules of Civil Procedure (16th ed. 1985), when issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. In view of the fact that Count II of defendant's counterclaim sought damages compatible with rescission, and the fact that plaintiff failed to object when defendant presented testimony in support thereof, we hold that the rescission issue was tried by consent, and that Count II of defendant's counterclaim is deemed amended (if that be necessary) to conform to such evidence. *Seaton v. Weir*, 633 S.W.2d 212, 214[2] n. 4 (Mo.App.1982); *Moranz v. Schiller*, 525 S.W.2d 785, 787[4] (Mo.App.1975).

■ In these unique circumstances, we hold that the trial court, in assessing defendant's damages on Count II of her counterclaim, could have properly awarded her the amount by which the aggregate of her payments to plaintiff and her expenditures for carpeting and drapes exceeded the reasonable value of the use of the property during the 19 months between the signing of the agreement and the judgment restoring possession to plaintiff.

As to the aggregate of defendant's payments and expenditures, there was evidence to support a finding that such sum was $3,768. As to the reasonable value of the use of the property, plaintiff testified that the "reasonable rental value" of the property at the time the agreement was signed was $200 per month. The trial court, however, was not obliged to accept that figure, or to find that $200 per month would have remained reasonable while the defects progressively worsened.

■ Although we cannot ascertain how the trial court arrived at $1,300 as defendant's damages on Count II of her counterclaim, we can, and do, hold that, utilizing the formula set forth above, there is adequate evidence to support the $1,300 figure. Awarding that sum to defendant leaves plaintiff with the property and, according to defendant's testimony, also leaves plaintiff $2,175 (the monthly installments he received from defendant) to compensate him for the 19 months that defendant had the right to occupy the property. Additionally, it appears that plaintiff will have the benefit of the carpet and drapes defendant installed in the house.

We recognize, of course, that this is a different measure of damages than the methods used in *Major* and *Stegan*. This case, however, is fundamentally different than those. We have pointed out that in those cases, the buyers retained the property, while here the builder-vendor got it back. Indeed, in this case, plaintiff—who, it will be remembered, asked, in Count I of his petition, that the court declare the agreement null and void—received relief compatible with rescission, as he recovered the property and, after paying the damages awarded defendant on Count II of her counterclaim, will still have $2,175 of defendant's money to indemnify him for the 19 months defendant held the property. The trial court's judgment, in our opinion, is fair to both parties, and we cannot conceive any other result that would have, in the circumstances of this case, better served the interests of justice.

Judgment affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.