**Joseph G. HERSHEWE, Respondent,**

**v.**

**Edward and Gloria PERKINS, Appellants.**

**No. WD 61650.**

Missouri Court of Appeals, Western District.

April 8, 2003.

John R. Brage, St. Joseph, MO, for Appellant.

John F. Burns, St. Joseph, MO, for Respondent.

Before THOMAS H. NEWTON, P.J., ROBERT G. ULRICH and EDWIN H. SMITH, JJ.

THOMAS H. NEWTON, P.J.

Edward and Gloria Perkins ("appellants") appeal the judgment of the trial court which found them liable under the doctrine of implied warranty of quality and fitness for damages sustained to the retaining walls of Joseph G. Hershewe's ("respondent") home.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellants sold a piece of land with a newly constructed home on it to respondent. The property had five retaining walls constructed upon the premises, which were built by appellants during the construction of the home.

A portion of one of the retaining walls in the respondent's backyard collapsed. Respondent filed a petition in the Buchanan County Circuit Court alleging that the defective retaining walls breached the implied warranty of quality and fitness.

At the bench trial, respondent presented the testimony of Lawrence Fehner, a civil and structural engineer. Mr. Fehner examined the retaining walls and concluded that they were defective. John W. De-Vore, an owner of a landscaping business, also testified on behalf of the respondent. He stated that it was also his belief that the walls were defective and that it would cost $30,175 to fix them. After the trial, the trial court entered judgment in favor of the respondent in the amount of $30,000.

Appellants bring two points on appeal. In Point I, appellants allege that the trial court erred, in finding them liable for breaching the implied warranty of quality and fitness, "because that judgment misapplies the law in that the [retaining] walls in question were neither part of the residential structure, immediately supportive of it, or integral to its use," and, therefore, the retaining walls were not covered by the implied warranty. In Point II, it is alleged that the trial court erred in the amount of the damages awarded to respondent "because the only damage estimate of $30,175

included $2,000 for 'standard' blocks ... [and] no evidence was adduced to establish that 'standard' blocks were necessary to adequately rebuild the walls at issue."

## II. STANDARD OF REVIEW

Appellate review of a court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Id.* at 32. "This court defers to the trial court's findings of fact, due to the superior ability of the trial court to judge the credibility of the witnesses." *Nolte v. Corley*, 83 S.W.3d 28, 33 (Mo.App. W.D.2002). "All evidence and permissible inferences favorable to the prevailing party are accepted as true, while all evidence and inferences to the contrary are disregarded." *Id.*

## III. LEGAL ANALYSIS

In Point I, appellants assert that the trial court erred in finding them liable for breaching the implied warranty of quality and fitness in the sale of a newly constructed home, "because that judgment misapplies the law in that the [retaining] walls in question were neither part of the residential structure, immediately supportive of it, or integral to its use," and, therefore, the retaining walls were not covered by the implied warranty. On appeal, no party disputes that the lawsuit was grounded in the theory that appellants were liable for the collapsed retaining wall based on the doctrine of implied warranty of quality and fitness, and that this was the basis in law for the trial court's judgment in favor of respondent. It is the appellants' contention that the trial court erred in finding for respondent based on the implied warranty of quality and fitness

because this warranty does not cover retaining walls as a matter of law.

The Supreme Court of Missouri first recognized that the doctrine of implied warranty of quality and fitness applied to the purchase of residential real property in *Smith v. Old Warson Development Co.*, 479 S.W.2d 795 (Mo. banc 1972). The Court found the following:

Although considered to be a 'real estate' transaction because the ownership to land is transferred, the purchase of a residence is in most cases the purchase of a manufactured product—the house. The land involved is seldom the prime element in such a purchase, certainly not in the urban areas of the state. The structural quality of a house, by its very nature, is nearly impossible to determine by inspection after the house is built, since many of the most important elements of its construction are hidden from view. The ordinary 'consumer' can determine little about the soundness of the construction but must rely upon the fact that the vendor-builder holds the structure out to the public as fit for use as a residence, and of being of reasonable quality.... The home here was new and was purchased from the company which built it for sale. The defect here was clearly latent and not capable of discovery by even a careful inspection. Defendant was the developer of the subdivision in which the house was located.... Common sense tells us that a purchaser under these circumstances should have at least as much protection as the purchaser of a new car, or a gas stove, or a sump pump, or a ladder. *Id.* at 799.

■ Over the years, how this doctrine applies to the land sale of a new home has become more defined. For example, for the "Old Warson doctrine" to apply, it has been held imperative that the sale of the

home be to the first purchaser of a newly constructed home, and that "the builder and vendor are one and the same." *Helterbrand v. Five Star Mobile Home Sales, Inc.,* 48 S.W.3d 649, 657 (Mo.App. W.D. 2001) (quotation omitted). It is not disputed by any party that all of the above requirements have been met here. The sole legal issue in contention is whether an exception to the *Old Warson* doctrine applies to the defective retaining walls. It is well established that the implied warranty of quality and fitness "does not apply to an improvement outside the house, which is not an integral part of the structure or immediately supporting it." *Wilkinson v. Dwiggins,* 80 S.W.3d 849, 851 (Mo.App. E.D.2002) (citing *San Luis Trails Ass'n v. E.M. Harris Bldg. Co.,* 706 S.W.2d 65, 68–69 (Mo.App. E.D.1986)); *see also Helterbrand,* 48 S.W.3d at 657; *Christensen v. R.D. Sell Constr. Co.,* 774 S.W.2d 535, 538–39 (Mo.App. W.D.1989). Indeed, it is logical that the doctrine of implied warranty and fitness in the sale of a new home does not apply to an item extraneous or unrelated to the home. *See Old Warson,* 479 S.W.2d at 799 (buyer must "rely upon the fact that the vendor-builder holds the *structure* out to the public as fit for use as a residence, and of being of reasonable quality") (emphasis added).

Appellants argue that they are not liable for the defective retaining walls because they fall outside of the implied warranty of quality and fitness. They correctly state that "[a]ll of the cases that have attempted to further delineate the application of the doctrine set forth in *Old Warson* have indicated that the structure at issue must either be a part of the residential structure, provide direct support to the residential structure, or be integral to its use." It is appellants' argument that because the retaining walls do not fall within this aforementioned definition, the trial court erred as a matter of law in finding them liable

under the implied warranty of quality and fitness. After reviewing the relevant case law, we must disagree.

In *Christensen,* we considered the issue of whether the driveway and stairs leading to a new residence were covered under the implied warranty of quality and fitness. 774 S.W.2d at 538–39. We noted in *Christensen* that it was appellant's argument that these aforementioned items were not covered by the doctrine because the homeowner "failed to present evidence that the defective driveway or defective stairs were an integral part of the structure of the house or supported the structure of the house." *Id.* at 538. We stated that "Appellant's argument is rejected because it misconstrues existing law and inappropriately attempts to narrow the scope of coverage afforded by implied warranties of new home construction." *Id.* We went on to expand in our analysis as follows:

> There is simply no existing authority for appellant's assertion that a plaintiff must first present evidence of a structural defect, such as a defect in the foundation, basement or load bearing wall, before the plaintiff can recover for defects in the construction of a driveway or stairs leading to the front door of the house. To follow appellant's suggestion could produce some bizarre results. In the case herein, under appellant's view, the driveway could drop forty feet and no liability could occur and/or the stairs could pull completely away from the house and no liability would occur. This court specifically rules herein that an implied warranty protects the purchaser of a newly constructed home from latent defects in its construction, including the driveway and front stairway.

*Id.* Therefore, we made clear in *Christensen* that in order to fall within the implied warranty of quality and fitness, the item in question need not be attached to the home

or provide immediate structural support to the home. *Id.* Although those aforementioned factors are indicative that an item should fall within the warranty's confines, it is also critical to assess whether the item in question is integral to the home's use. *Id.*

In attempting to distinguish *Christensen* from our case, appellants argue that the retaining walls fall outside the implied warranty of quality and fitness because they are "not an integral part of the structure or immediately supporting [the house]." Critical to this argument is appellants' contention that the retaining walls are merely cosmetic in nature and do not fulfil a functional purpose integral to the home. In their appellate briefs, appellants argue the following:

> [T]his appeal involves exterior retaining walls that are completely cosmetic in nature. There is nothing in the record whatsoever to suggest that they are, in any way, 'essential' to the residence in question. They are simply a welcome amenity to the property.
>
> * * *
>
> Clearly, the various photographs contained in the record demonstrate that these walls are part of the landscaping and are purely decorative in nature.

These assertions by appellants are inaccurate. There was ample evidence at trial that these retaining walls played an "integral" role to the house. Respondent's expert witness, Lawrence Fehner, a civil and structural engineer, testified at trial to the following:

Q. Okay. Can you tell the Court what you observed on that day.

A. Basically we have several retaining walls that are located around the home and they've been built with Keystone— want to call them rocks, but basically they're concrete units. And you stack them up to form a retaining wall. And what I found was that one of the walls next to the house on the back side of the house had actually collapsed, it had fallen over. And they'd already done some clean-up work in that area, tried to move some stuff around trying to keep water from leaking into the basement in that area. But I was able to observe the edging of the collapsed area and some of the materials that was in there. And then I reviewed the rest of the retaining walls around the home.

* * *

*Retaining walls have a job. They have to hold a large pile of soil back. And there's nothing holding that except the wall itself and the footing on which it sits.*

* * *

[I]n the case of the Hershewe's home is what we have is called the gravity wall. It's just a mass of stone there trying to hold the dirt back. The problem with the Hershewe's house is the stones are stacked up high enough that there's just not enough mass there to keep them from falling over. The dirt just simply pushes them over. If they would have been tied back or you would have had the gravel, all the other things that are recommended, instead of just having a thin pile of stones holding dirt back, now you would have had a more larger mass holding the dirt back and they would have performed fine. (emphasis added)

Further supporting respondent's case at trial, that these retaining walls fulfilled a critical function integral to the house, was the testimony of John W. DeVore, owner of a private landscaping business. He stated the following:

Q. Did it appear to you in reviewing these walls that the bottom-most row of stones on any of these walls

had moved? Other than the collapsed portion.

A. Well, there was water running through them, there was mud running through them when I was down there that night. I was down there the night that it blew out until midnight moving—getting the gutters free so water wouldn't come in the house. I was there until midnight that night.

Q. And that was where the downspout near where the collapse wall was blocked by some debris, is that right?

A. Yeah, it was totally—you saw it, too. It was mashed. I was trying to keep the water out of the house.

Q. And the concern with the water in the house was that if the downspout was clogged up the water couldn't get out, is that right?

A. Yes, sir.

Accordingly, it cannot be contended that the retaining walls do not have a functional purpose that directly benefits the house. The very name of the item, *retaining* walls, evidences the fact that it fulfils a purpose. "Retain" is defined as follows: "Restrain, Prevent; . . . to hold secure or intact (as in a fixed place or condition): prevent escape, loss, leakage." *Webster's Third New International Dictionary* 1938 (3d ed.1993). While a retaining wall may not provide physical support to keep the home standing, it cannot reasonably be disputed that it plays an integral role in the enjoyment of respondent's home. Appellants attempt to undermine the functional role of the retaining walls by stating in their brief the following: "Respondent indicated that he continued to live in the residence even after the wall collapsed. He further indicated that he continued to use the patio depicted in these exhibits after the wall collapsed." We flatly reject-ed this argument in *Christensen* that the house had to be unusable somehow in order to fall within the warranty's confines. *Id.* at 538 ("The fact that the Christensens continued to use the defective driveway and stairs to the front door of their house does not defeat their cause of action.").

■ Indeed, *Christensen* guides us to the result we reach today. Like in *Christensen*, we are dealing with a part of a newly constructed house that, while it does not physically support the home, it plays an integral role in the enjoyment of the home. Whether it is a porch/driveway (like in *Christensen* ), or a retaining wall (today's case), the implied warranty of quality and fitness covers those items surrounding the home that are critical to its function and viability. *Wilkinson*, 80 S.W.3d at 851. Accordingly, the trial court did not err in finding that the retaining walls in question fell under the implied warranty of quality and fitness, and that, therefore, appellants were liable for the damages sustained to these defective retaining walls. Point denied.

In Point II, it is alleged that the trial court erred in the amount of damages awarded to respondent "because the only damage estimate of $30,175 included $2,000 for 'standard' blocks . . . [and] no evidence was adduced to establish that 'standard' blocks were necessary to adequately rebuild the walls at issue." As previously stated, the judgment of the trial court "will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy*, 536 S.W.2d at 32. "This court defers to the trial court's findings of fact, due to the superior ability of the trial court to judge the credibility of the witnesses." *Nolte*, 83 S.W.3d at 33.

The appellants argue that the trial court's award of $30,000 was erroneous "because the only damage estimate of $30,175 included $2,000 for 'standard' blocks ... [and] no evidence was adduced to establish that 'standard' blocks were necessary to adequately rebuild the walls at issue." [1] Appellants argue that "[t]his case should therefore be remanded with directions to amend the judgment to the amount of $29,175." To support this contention, appellants quote *Ribando v. Sullivan* for the proposition that the plaintiff is entitled to "whichever is lower, as between the cost of repair and the diminution of value (diminution meaning the difference in value of the house if it had been constructed properly compared with its actual value as constructed)." 588 S.W.2d 120, 124 (Mo.App. W.D.1979). But when applying this standard of law, we find no indication that the award in question was not supported by substantial evidence.

At trial, two experts testified on behalf of respondent in regard to the issue of damages sustained because of the defective retaining walls. Mr. Fehner, a civil and structural engineer, testified that it was his belief that $30,000 was a reasonable figure for damages in this case, stating that: "I haven't priced it out exactly, but that doesn't strike me as atypical, you know, or go way off the mark number." The respondent himself testified at trial, and he stated that it was his belief, after speaking to Mr. Fehner, that $30,000 was the diminution in value in his home as a result of the defective retaining walls.

Finally, Mr. DeVore, owner of a landscaping business, testified in detail at trial as to what needed to be done to reconstruct the walls, and he stated that the job would cost $30,175. Appellants focus the bulk of their efforts attacking Mr. DeVore's testimony in order to explain why the trial court's award was not backed by substantial evidence. More specifically, it is appellants' contention that the estimate of $30,175 was $2,000 too high because it included $2,000 for standard blocks [instead of using compact blocks which would be $2,000 cheaper], and "there was no evidence presented that indicated that the $2,000 expense to obtain 250 'standard' blocks was necessary in order to correct any alleged defects in the walls at issue." Accordingly, so the argument goes, Mr. DeVore's estimate to complete the job should have really been $29,175, and, therefore, the judgment of the trial court awarding respondent $30,000 was off by $825 and the award should be reversed accordingly.

■ The problem with this argument is that Mr. DeVore's estimate was $30,175, and that "standard blocks" should have been used. Appellants were free to counter this witness testimony through providing evidence of their own. For example, appellants could have called their own expert witness to testify that the job would cost less than $30,000 to repair, or that compact blocks would have been sufficient to complete the job in an adequate manner. But appellants did none of this, and present no authority for the contention that a damages estimate must cast away all doubt that another method could be

**1.** It was initially appellants' impression that the award given to respondent was $31,175, and appellants argued that "the judgment should not have been more than $30,000 in any event." In actuality, the trial court's award *was* for $30,000. In appellants' reply brief, this mistake was noted as follows:

"Counsel for Appellants admits that, at the time of drafting the Appellants' initial brief, he was (for some reason) under the mistaken impression that the underlying judgment was for $31,175, and not for the actual figure of $30,000."

more cost effective.[2] "Generally, damages need not be established with absolute certainty, but reasonable certainty is required as to both existence and amount, and the evidence must not leave the matter to speculation." *Bechtle v. Tandy Corp.*, 77 S.W.3d 689, 695 (Mo.App. E.D.2002) (citing *Affiliated Acceptance Corp. v. Boggs*, 917 S.W.2d 652, 657 (Mo.App. W.D.1996)). Here, Mr. DeVore spoke precisely as to how he calculated the damages award to total $30,175. This testimony was as follows:

Q. Were you asked to give an estimate regarding the reconstruction of the walls in accordance with the specifications of Keystone?

A. Yes.

\* \* \*

Q. And did you also determine that the walls needed to have a geogrid system?

\* \* \*

A. Yes.

Q. Okay. And with regard to the geogrid system, in your evaluation of the cost of reconstructing these walls, did you take into consideration putting a geogrid system behind all the walls, or was there one particular wall that was low enough that didn't need a geogrid system?

A. Just the one. There was one.

Q. And would that be Wall No.— there's a Plaintiff's Exhibit No. 5 that we've been using during this trial, Mr. DeVore. And I don't know if you're oriented to this, but I'll just describe for you, this is a

survey of the Hershewe property and we've arbitrarily marked the walls 1, 2, 3, 4 and 5. Is the wall that you're referring to now Wall No. 4?

A. Yes.

Q. Okay. All of the other walls of sufficient height that in accordance with Keystone specifications they do require geogrid, is that correct?

A. That's what they say.

Q. Okay. And would you have to do some excavation to get the walls ready for reconstruction?

A. Yes.

Q. Can you describe for the Court what kind of excavation you would have to do?

A. Keystone said there would have to be at least six to eight feet behind the wall a geogrid.

Q. And then what kind of fill does Keystone recommend?

A. It would be three-quarter, one-inch fill rock.

Q. Okay. And taking all of these things into consideration, did you put together an estimate as to what would be the reasonable cost of constructing these walls in accordance with the specifications of Keystone?

A. Yes.

\* \* \*

Q. And what was the amount of the estimate to reconstruct these Keystone walls in accordance with Keystone specifications?

A. I have down here $30,175.

---

**2.** Even had such conflicting evidence been submitted at trial, under our standard of review we would not be in a position to re-evaluate the competing testimony. *See Lancaster v. Neff*, 75 S.W.3d 767, 771 (Mo.App. W.D.2002). ("In assessing if there is substantial evidence, we must defer to the trial court on factual issues and cannot substitute our judgment for that of the trial judge. Where there is conflicting evidence, the trial court has the prerogative to determine the credibility of witnesses, accepting or rejecting all, part or none of the testimony.").

The fact that respondent's other expert witness verified that this figure was a reasonable sum further supports the trial court's award of $30,000. Under our standard of review, it is the appellants' burden to demonstrate that the trial court's award was not supported by "substantial evidence." *Nolte*, 83 S.W.3d at 33. This they failed to do. As such, we affirm the trial court's judgment in the amount of $30,000.

## IV. CONCLUSION

Based on the foregoing, and after a thorough review of the record on appeal, we affirm the trial court's judgment.

ROBERT G. ULRICH and EDWIN H. SMITH, JJ. concur.